**SOUTH CAMDEN CITIZENS IN ACTION, Geneva Sanders, Pauline Woods, Barbara Pfeiffer, Julita Gilliard, Oscar Lisboa, Shirley Rios, Phyllis Holmes, Gwen Peterson, Latoya Cooper, and Julio Lugo, Plaintiffs,**

v.

**NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION and Robert C. Shinn, Commissioner of the New Jersey Department of Environmental Protection, in his official capacity, Defendants,**

and

**St. Lawrence Cement Co., L.L.C., Defendant–Intervenor.**

No. CIV.A. 01–702.

United States District Court, D. New Jersey.

April 19, 2001.

---

Olga D. Pomar, Camden Regional Legal Services, Inc., Camden, NJ, Jerome Balter, Michael Churchill, Philadelphia, PA, Luke W. Cole, San Francisco, CA, Attorneys for Plaintiffs.

John J. Farmer, Jr., Attorney General of New Jersey, James M. Murphy, Deputy Attorney General, Trenton, NJ, Attorneys for Defendants, the New Jersey Department of Environmental Protection and Robert C. Shinn, Jr., Commissioner of the New Jersey Department of Environmental Protection.

Brian S. Montag, Catherine A. Trinkle, Pitney, Hardin, Kipp & Szuch, LLP, Morristown, NJ, Attorneys for the Defendant–Intervenor, St. Lawrence Cement Co., L.L.C.

## OPINION

ORLOFSKY, District Judge

TABLE OF CONTENTS

I. Introduction .................................................... 450

II. Procedural History ............................................. 452

III. Findings Of Fact and Conclusions of Law .................................. 452
    A.   The Parties ......................................................... 452
    B.   SLC's Proposed Facility ........................................... 453
    C.   SLC's Air Contaminant Emissions and Emissions Controls ................. 453
    D.   SLC's Truck Traffic .............................................. 454
    E.   SLC's Permit Application and Construction of the Facility ................. 454
    F.   SLC's Community Outreach and Community Support ...................... 455
    G.   Applicable Environmental Standards .................................. 456
    H.   NJDEP's Permitting Process ......................................... 457
    I.   Waterfront South ................................................. 458
    J.   The Health of the Community and the Effects of the SLC Facility on
        Health ....................................................... 460
        1.   Current Health of the Community .................................. 460
        2.   Effects of PM Inhalation ........................................ 461
        3.   Effects of Ozone ............................................... 466
    K.   The NJDEP's Evaluation of SLC's Permit Application ..................... 468
    L.   Public Comment on the NJDEP's Air Permits for the SLC Facility .......... 469
    M.   Jurisdiction ...................................................... 470
    N.   The Governing Legal Standard for Preliminary Injunctive Relief ............. 470

O.  Likelihood of Success on the Merits ....................................... 472
P.  The Existence of a Private Cause of Action Under Section 602 of Title VI ..... 473
Q.  Declaratory Judgement on the Requirements of Title VI Implementing
      Regulations ......................................................... 474
R.  Title VI Disparate Impact Analysis ...................................... 481
S.  Plaintiffs' Prima Facie Case ........................................... 484
    1.  Adverse Impact .................................................. 484
    2.  Disparate Impact ............................................... 491
    3.  Causation ...................................................... 493
T.  Defendants' Rebuttal Burden ............................................ 495
U.  Irreparable Harm ...................................................... 497
V.  Irreparable Harm to Other Parties, and the Public Interest ................ 500
W.  Availability of Injunctive Relief ...................................... 502
X.  Waiver of Security .................................................... 503

IV.  CONCLUSION ................................................................ 505

## I.  INTRODUCTION

Plaintiffs' application for preliminary injunctive and declaratory relief presents difficult and novel issues arising under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, which prohibits discrimination based on race and national origin by recipients of federal funding. At its heart, this dispute centers around the allegedly racially discriminatory siting of an industrial facility in an impoverished neighborhood of Camden, New Jersey, ninety-one % of whose residents are persons of color.

To understand the nature of the issues presented, I shall set forth a brief summary of the operative facts. Plaintiff, South Camden Citizens In Action ("SCCIA"), is an unincorporated community organization, whose members are residents of a neighborhood in Camden, New Jersey, known as "Waterfront South." The individual Plaintiffs are residents of Waterfront South and members of SCCIA. Defendant, the New Jersey Department of Environmental Protection ("NJDEP"), a New Jersey state agency, is responsible for enforcing the environmental laws and regulations of the State of New Jersey, as well as federal law, where applicable. The NJDEP receives federal funding and is thus obliged to conform its operations to the restrictions imposed by Title VI and the regulations which have been promulgated to implement Title VI. Defendant, Robert C. Shinn, Jr. ("Shinn"), is the Commissioner of the NJDEP. Defendant Intervenor, St. Lawrence Cement Co., L.L.C. ("SLC"), manufactures and distributes cement products. SLC has built and proposes to operate a facility in Waterfront South to grind and process granulated blast furnace slag ("GBFS"). SLC sells the ground GBFS as an additive to portland cement.

SLC's proposed facility will emit certain pollutants into the air. These pollutants will include particulate matter (dust), mercury, lead, manganese, nitrogen oxides, carbon monoxide, sulphur oxides and volatile organic compounds. The GBFS will arrive by barge at a Camden port facility. Trucks will then deliver the GBFS to SLC's proposed facility in Waterfront South, a distance of approximately three miles. The GBFS will then be processed and transported back to the port by truck. Annually, there will be approximately 35,000 inbound delivery trucks arriving at SLC's proposed facility and approximately 42,000 outbound truck deliveries departing from the facility. Inbound truck deliveries will occur on about eighty days per year with approximately 500 truck deliveries per day. Outbound truck departures from the SLC facility will occur on approximate-

ly 225 days per year, with about 200 trucks departing per day. The contemplated truck routes pass through the Waterfront South Community.

The population of Waterfront South is 2,132, forty-one percent of whom are children. Ninety-one percent of the residents of Waterfront South are persons of color. Specifically, sixty-three percent are African–American, twenty-eight percent are Hispanic, and nine percent are non-Hispanic white. The residents of Waterfront South suffer from a disproportionately high rate of asthma and other respiratory ailments.

The Waterfront South neighborhood is already a popular location for the siting of industrial facilities. It contains the Camden County Municipal Utilities Authority, a sewage treatment plant, the Camden County Resource Recovery facility, a trash-to-steam plant, the Camden Cogen Power Plant, a co-generation plant, and two United States Environmental Protection Agency ("EPA") designated Superfund sites. Four sites within one-half mile of SLC's proposal facility are currently being investigated by the EPA for the possible release of hazardous substances. The NJDEP has also identified fifteen known contaminated sites in the Waterfront South neighborhood.

As described in greater detail in this Court's Findings of Fact and Conclusions of Law set forth below, the NJDEP granted the necessary air permits to SLC to allow its proposed facility to begin operations. In doing so, the NJDEP considered only whether the facility's emissions would exceed technical emissions standards for specific pollutants, especially dust. Indeed, much of what this case is about is what the NJDEP failed to consider. It did not consider the level of ozone generated by the truck traffic to and from the SLC facility, notwithstanding the fact that

the Waterfront South community is not currently in compliance with the National Ambient Air Quality Standard ("NAAQS") established by the EPA for ozone levels, nor did it consider the presence of many other pollutants in Waterfront South. It did not consider the pre-existing poor health of the residents of Waterfront South, nor did it consider the cumulative environmental burden already borne by this impoverished community. Finally, and perhaps most importantly, the NJDEP failed to consider the racial and ethnic composition of the population of Waterfront South.

At this stage of these proceedings, this Court must resolve the following complex questions: (1) Whether the criteria and methods used by the NJDEP to evaluate air permit applications, namely, its exclusive reliance on EPA emissions maximums, especially the NAAQS for particulate matter ("PM–10"), without consideration of the totality of the health and environmental circumstances of the community in which the proposed facility will be located, violates the regulations promulgated by EPA to implement Title VI of the Civil Rights Act of 1964, which prohibits discrimination based on race and national origin; and (2) Whether the NJDEP's decision to issue the necessary air permits to SLC to operate its proposed facility in the Waterfront South Community constitutes disparate impact discrimination based on race and national origin in violation of EPA regulations promulgated to implement section 602 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d–1.

For the reasons which follow in this Court's Findings of Fact and Conclusions of Law made pursuant to Fed.R.Civ.P. 52(a), I conclude that: (1) The NJDEP's failure to consider any evidence beyond SLC's compliance with technical emissions standards, and specifically its failure to

consider the totality of the circumstances surrounding the operation of SLC's proposed facility, violates the EPA's regulations promulgated to implement Title VI of the Civil Rights Act of 1964; and (2) Plaintiffs have established a prima facie case of disparate impact discrimination based on race and national origin in violation of the EPA's regulations promulgated pursuant to section 602 of the Civil Rights Act of 1964.

Accordingly, I shall grant Plaintiffs' application for a preliminary injunction, vacate the NJDEP's issuance of SLC's air permits, and remand this case to the NJDEP and Commissioner Shinn to make appropriate findings consistent with this Opinion. The NJDEP's findings shall be filed with the Court within thirty days of the date of this Opinion. SLC shall be enjoined from operating its proposed facility pending further order of this Court. This Court shall retain jurisdiction.

## II. PROCEDURAL HISTORY

SLC selected and signed a lease for the site of the proposed facility in March, 1999. Shortly thereafter, it began preliminary negotiations with the NJDEP. SLC submitted its formal air permit applications to the NJDEP on August 5, 1999. The NJDEP designated SLC's application "administratively complete" on November 1, 1999. This designation allowed SLC to begin construction of the facility at its own risk pending final approval of the permits.

The NJDEP issued draft air permits for the facility on July 25, 2000. The NJDEP invited public comment on the draft air permits and scheduled a public hearing on the permits. Montag Decl., Exh. A; Pomar Cert., Exh. H. The public hearing was held on August 23, 2000. Montag Decl., Exh. B. On October 31, 2000, NJDEP simultaneously issued a written response to the comments made at the public hear-ing and final approval for SLC's air permits. Montag Decl., Exh. C; Diosey Decl., Exh. E.

After the public hearing, but before the NJDEP responded to the public comments or the final permits were issued, Plaintiffs filed an administrative complaint with the EPA's Office of Civil Rights ("OCR") by letter dated October 4, 2000. Montag Decl. at Exh. D. On the same date, Plaintiffs filed a complaint with the NJDEP, requesting a grievance proceeding pursuant to 40 C.F.R. § 7.90 of the EPA's Civil Rights Regulations. Pomar Cert., Exh. N. There is no evidence in the record to indicate that any action has been taken by the NJDEP or EPA's OCR in response to the filing of these administrative complaints.

On February 13, 2001, Plaintiffs filed a verified Complaint with this Court against the NJDEP and the NJDEP's Commissioner, Robert C. Shinn, alleging that the method the NJDEP used to evaluate and grant SLC's air emissions permits violated Title VI of the Civil Rights Act of 1964. On February 22, 2001, this Court signed a consent order allowing SLC to intervene in this action as a defendant. *See* Consent Order (filed February 22, 2001). Oral argument on Plaintiffs' application for a preliminary injunction was held on March 23, 2001.

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. The Parties

1. Plaintiff, South Camden Citizens in Action ("SCCIA"), is an unincorporated community organization. Its members are residents of a neighborhood in Camden, New Jersey, known as "Waterfront South." Compl. at ¶ 5.

2. The individual Plaintiffs, Geneva Sanders ("Sanders"), Pauline Woods ("Woods"), Barbara Pfeiffer ("Pfeiffer"),

Julita Gilliard ("Gilliard"), Oscar Lisboa ("Lisboa"), Shirley Rios ("Rios"), Phyllis Holmes ("Holmes"), Gwen Peterson ("Peterson"), Latoya Cooper ("Cooper"), and Julio Lugo ("Lugo"), are residents of Waterfront South and members of SCCIA. Compl. at ¶¶ 6–15. Sanders, Woods, Gilliard, Rios, Holmes, Peterson, and Cooper are African–American. Pfeiffer is white. Lisboa and Lugo are Hispanic. *Id.*

3. Defendant, the New Jersey Department of Environmental Protection ("NJDEP"), a New Jersey State Agency, is responsible for implementing and enforcing the environmental laws and regulations of the State of New Jersey.[1] Defendant, Robert C. Shinn, Jr. ("Shinn"), is the Commissioner of the NJDEP.

4. Defendant–Intervenor, St. Lawrence Cement Co., L.L.C. ("SLC"), is a member of the Holderbank Financiere Glaris Ltd. ("Holderbank") group of companies. Meadows Decl. at ¶ 2. SLC is a multinational company which is a manufacturer and distributor of "cementitious products." *Id.* at ¶ 3. In the United States, SLC has facilities located in Hagerston, Maryland and Catskill, New York. *Id.* at ¶ 2.

### B. SLC's Proposed Facility

5. In 1998, SLC forecast an increase in construction and therefore an increase in demand for its products. SLC decided to construct a new manufacturing facility on the mid-Atlantic seaboard. After considering other locations in Delaware, Pennsylvania, and New Jersey, SLC selected a site owned by the South Jersey Port Corporation ("SJPC"), located in the Waterfront South neighborhood of Camden, New Jersey. Meadows Decl. at ¶¶ 5–8. On March 8, 1999, SLC signed a 25–year lease

agreement with the SJPC, with an option for two 10–year renewals. *Id.* at ¶ 9.

6. SLC plans to use the proposed Camden facility to grind and process granulated blast furnace slag ("GBFS"). GBFS is a by-product of the steel-making industry. SLC will market the ground GBFS ("GGBFS") under the trade name GranCem®. GranCem® is used as an additive to strengthen portland cement. Meadows Decl. at ¶ 3.

7. SLC plans to import, by barge, and process approximately 850,000 tons of GBFS and 16,500 tons of gypsum annually. Because the on-site Broadway port cannot accommodate the import barges, barges will arrive and be offloaded at the Beckett Street Terminal. Trucks will then transport the GBFS and gypsum three miles to the SLC facility, where they will be offloaded into large, open piles. Front-end loaders will transfer the GBFS to a feed hopper. From the feed hopper, the GBFS will be transported by conveyor belt to a vibrating screen, which will sift out oversize materials. The remaining material will proceed via conveyor belt to the roller mill, where it will be heat dried and then ground into smaller particles. The GGBFS will be stored in storage silos until it is transported out of the facility by truck. Pomar Cert. at Exhs. H, I.

8. Before processing, GBFS particles are the size and texture of beach sand. After processing, the ground GBFS ("GGBFS") material will be the size and texture of powdered sugar. Pomar Cert. at Exh. H.

### C. SLC's Air Contaminant Emissions and Emission Controls

9. The primary pollutants produced by the SLC facility itself will be emitted into

---

**1.** *See* N.J.S.A. § 13:1D–9 (establishing the New Jersey Department of Environmental Protection).

the air. Diosey Decl. at ¶ 4. These pollutants include particulate matter (dust), mercury, lead, manganese, nitrogen oxides, carbon monoxide, sulfur oxides, and volatile organic compounds. Diosey Decl., Exh. D(4).

10. Air contaminant emissions will be generated at the following stages of GBFS processing: (1) fugitive dust emissions will be generated from the handling and movement of GBFS when it is offloaded from trucks, piled, and then placed in the hopper; (2) GBFS particles may be blown into the ambient air once on the conveyor belt; (3) various air pollutants will be produced during the heating and grinding processes; and (4) GGBFS emission may occur when the GGBFS is stored and offloaded for delivery off-site. Pomar Cert. at Exh. I.

11. SLC proposes to manage and minimize the air pollution by: (1) keeping the GBFS wet by spraying it with water while it is being offloaded, transported by truck, and piled, thereby minimizing fugitive emissions; (2) watering and sweeping the roads at the facility; (3) covering the vibrating screen and conveyor belts, thereby protecting the GBFS from the wind; (4) utilizing baghouse controls, which function like vacuum cleaners, to siphon off particles before discharging the exhaust stream from the roller mill into the atmosphere; (5) monitoring visible dust emissions pursuant to a "dust management plan" ("DMP"); and (6) monitoring the radioactivity levels of the raw materials. Pomar Cert. at Exh. I.

### D. SLC's Truck Traffic

12. Trucks will be used to deliver the GBFS from the Beckett Street Port to the SLC facility, which is approximately three miles away. Annually, there will be approximately 35,000 inbound delivery trucks arriving at the SLC facility annually and approximately 42,000 outbound delivery trucks departing from the SLC facility. Inbound truck deliveries to the facility will occur about 80 days per year, with approximately 500 truck deliveries per day; outbound truck departures will occur approximately 225 days per year, with approximately 200 trucks departing per day. Pomar Cert. at Exh. I.

13. The contemplated truck route passes through residential areas of the Waterfront South community. Smith Decl. at ¶ 19. In response to community input, SLC modified the original truck delivery route to minimize the number of residential streets used by SLC-contracted delivery trucks. *Id.*

### E. SLC's Permit Applications and Construction of the Facility

14. After executing the lease with the SJPC, SLC began the process of applying for the necessary construction and operating permits from the NJDEP. SLC retained the services of environmental engineers and consultants to assist with the permitting process. From SLC's perspective, the primary focus of the permitting process was to obtain air permits. Air permits are necessary because the grinding process used by SLC creates, *inter alia*, dust and particulate emissions, which are regulated by the state. Meadows Decl. at ¶¶ 11, 12.

15. SLC began "pre-application" discussions with the NJDEP in March, 1999. Meadows Decl. at ¶ 10. These discussions continued for five months and culminated in the formal submission of SLC's air permit applications to the NJDEP on August 5, 1999. Diosey Decl. at ¶ 6.

16. In a letter dated November 1, 1999, the NJDEP informed SLC that its application was "administratively complete." Pomar Cert., Exh. G. An application is designated as "administratively complete" when

the applicant has submitted all of the information the NJDEP needs to review and evaluate the proposal and decide whether to permit the facility. *Id.*

17. Once an application is deemed "administratively complete" by the NJDEP, however, the applicant may commence construction on the proposed facility. *See* N.J. Admin. Code tit. 7, § 27–8.24 ("[A]n applicant may construct, reconstruct, install, and/or put in place a source . . . while the Department reviews an application if . . . (1) The applicant has submitted a complete application to the Department . . . . [and] (4) The construction, reconstruction, installation and/or placement is not prohibited by any Federal law or requirements, including but not limited to PSD requirements [and] acid rain requirements.")

18. If an applicant decides to proceed with construction of a proposed facility while awaiting review of its permit application, it does so at its own risk. This policy is reflected in the NJDEP's November 1, 1999 letter to SLC, in which the NJDEP stated that:

> [T]his determination is only for administrative completeness and does not imply or guarantee that an Air Pollution Control Permit will be issued for the source. In addition, based on the technical review, the source may be subject to more additional [sic] control and operating requirements than is [sic] currently proposed by the company in the referenced applications.

Pomar Cert., Exh. G. SLC was fully aware of this policy when it undertook construction of the facility. Meadows Decl. at ¶ 13.

19. In late 1999, after receiving the NJDEP's letter indicating that its application was "administratively complete," SLC elected to begin construction of the proposed facility. Meadows Decl. at ¶ 18. SLC was very eager to have the facility operational in order to: (1) off-set construction expenses; and (2) beat its competitors in accessing and providing product to East Coast markets. Meadows Decl. at ¶ 14.

20. SLC expected to receive the final permit approvals from the NJDEP by June, 2000 and to have the facility operational by September, 2000. Meadows Decl. at ¶ 15. According to SLC, its expectation that it would receive final approval from the NJDEP for the facility was based on three considerations: (1) SLC intended to build a state-of-the-art facility; (2) SLC planned to install all required pollution control equipment; and (3) SLC believed the facility would be within applicable federal and state environmental, health, and emission standards. Meadows Decl. at ¶ 14.

21. As of March 2, 2001, the facility was still under construction and not yet ready to begin operations. Meadows Decl. at ¶ 17. SLC attributes the difference between the estimated and actual readiness date of the facility to unanticipated construction delays and delays in the permitting process. *Id.* at ¶ 16. SLC expected that the facility would be operational as of March 31, 2001. *Id.* at ¶ 17.

22. SLC estimates that it will lose approximately $200,000 per week in actual earnings if it does not commence operations in April, 2001. Meadows Decl. at ¶ 18.

### F. SLC's Community Outreach and Community Support

23. In July 1999, shortly before submitting its final air permit applications to the NJDEP, SLC began to solicit public support for the facility from the residents of Waterfront South. Smith Decl. at ¶¶ 2–4. SLC hired a local consultant, Morris Smith, Esq. ("Smith"), to manage its out-

reach and community involvement initiative. *Id.* at ¶ 1.

24. Smith arranged meetings between SLC representatives and municipal officials, local business leaders, community organizations, and residents. Smith Decl. at ¶¶ 2–4. The purpose of these meetings was to share information about the facility and obtain community input. SLC Br. at 16, Smith Decl. at ¶¶ 2–4.

25. SLC representatives held a "community support meeting" with members of the Plaintiff organization, SCCIA, in August, 1999, at the home of the SCCIA president, Rose Townsend. The purpose of the meeting was to obtain a letter of support for the SLC facility from SCCIA. Smith Decl., Exh. B. Those who attended the meeting discussed the operation of the facility, the prospective employment of Waterfront South residents by SLC, and environmental issues relating to the facility. Smith Decl. at ¶ 6, Exh. C.

26. SCCIA convened a community meeting on September 22, 1999, at the Camden Fellowship House, to discuss the impact of the facility on the Waterfront South neighborhood. Smith Decl. at ¶ 7.

27. When SCCIA did not convene another meeting, SLC decided to take the initiative in creating a community advisory committee. The "Community Advisory Panel" ("CAP") began meeting in January, 2000 at the SLC office. This group met a total of eighteen times between January, 2000 and October 31, 2000, when the final NJDEP permit was issued.

28. The CAP created a "Technical Advisory Group" ("TAG"). The purpose of the TAG was to provide CAP members and other interested parties with an "independent assessment of the environmental issues implicated by the Facility's operations." Smith Decl. at ¶ 12. Members of the CAP nominated and selected technical experts to evaluate the impact of the proposed facility on traffic, air quality, stormwater management, and health. *See* Smith Decl. at ¶ 13 and Exhs. G, H, I.

29. SLC provided funding to contract technical experts selected by the CAP to perform independent evaluations. The CAP selected: (1) Horner & Canter Associates ("Horner & Canter"), to study traffic issues; (2) Professor Ronald A. Chatterton of Villanova University, to study water impact issues; and (3) Dr. Irwin Berlin of Trinitas Hospital, to study health issues. Smith Decl. at ¶ 15 and Exhs. L, N, and Q.

30. In January, 2000, SCCIA decided not to participate in the CAP sponsored by SLC. Smith Decl. at ¶ 9. Olga Pomar, Esq., attorney for the Plaintiffs, however, attended several of the CAP meetings. Ms. Pomar participated in the nomination and final selection of Dr. Berlin ("Dr.Berlin"), to perform the TAG health analysis, and Dr. Chatterton ("Dr.Chatterton"), to perform the TAG water impact analysis. At some point, SCCIA instructed Ms. Pomar to discontinue her participation in the CAP. Smith Decl. at ¶ 16.

31. After the NJDEP granted SLC's permit requests, on October 31, 2000, the focus of the CAP meetings changed. The CAP meetings in November, 2000 and December, 2000 focused primarily on whether the State would acquire the Terraces, a housing development located near SLC. Smith Decl. at ¶ 28. SLC committed to assist residents of the Terraces in a "joint effort ... to persuade the State of New Jersey to support acquisition of the Terraces homes and relocation of the Terraces residents." Smith Decl., Exh. U.

### G. Applicable Environmental Standards

32. With the passage of the Clean Air Act ("CAA"), codified at 42 U.S.C. § 7401

*et seq.*, Congress delegated the authority to establish primary and secondary National Ambient Air Quality Standards ("NAAQS") to the EPA. *See* 42 U.S.C. § 7409(a). The Administrator of the EPA sets the NAAQS, "the attainment and maintenance of which in the judgment of the Administrator, based on such criteria and allowing an adequate margin of safety, are requisite to protect the public health." 42 U.S.C. § 7409(b)(1).

33. The CAA requires that new stationary sources of air pollutants, such as the proposed SLC facility, must meet established NAAQS. "Stationary sources" include buildings, structures, facilities, and installations. 42 U.S.C. § 7411.

34. Presently, the EPA has established NAAQS for the following six pollutants: (1) particulate matter less than 10 microns in diameter ("PM–10"); (2) ozone; (3) sulfur dioxide; (4) carbon monoxide; (5) nitrogen dioxide; and (6) lead. 42 U.S.C. § 7409(a); 40 C.F.R. § 50.

35. While the EPA is responsible for establishing the NAAQS, states are charged under the CAA with the primary responsibility for implementing the NAAQS within their borders and monitoring compliance. *See* 42 U.S.C. § 7407(a)("Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State by submitting an implementation plan for such State which will specify the manner in which national primary and secondary ambient air quality standards will be achieved and maintained within each air quality control region in such State.") States are required to devel-

op "state implementation plans" ("SIPS") which explain how they plan to measure and monitor pollutants, and to submit their SIPS to the EPA for approval. 42 U.S.C. § 7410.

36. The CAA established separate pollution control requirements for motor vehicle emissions. *See* 42 U.S.C. § 7521. Tailpipe emissions of vehicles are regulated under Title II of the CAA and are exempted by federal and state law from inclusion as secondary emissions from stationary facilities. Emissions are measured by the regular state inspection and monitoring of individual vehicles. *Id.; see also* N.J. Admin. Code tit. 7, § 27–14.

37. The NJDEP is required by law to apply the NAAQS established by the EPA in evaluating permit applications for facilities which, like the SLC's proposed facility, will emit air pollutants. In evaluating a permit request, the NJDEP assesses whether the operation of facility will cause or significantly contribute to a violation of the NAAQS. NJDEP Br. at 11.[2]

38. The EPA has also established Prevention of Significant Deterioration ("PSD") levels for some pollutants, including PM–10. "A PSD increment is the maximum increase in a pollutant's concentration that is allowed to occur above an earlier established baseline value as long as air concentrations stay below the standard." Montag Decl., Exh. C at 17; see also 40 C.F.R. § 52.21.

### H. NJDEP Permitting Process

39. The NJDEP is responsible for regulating and monitoring the production of air, water, and ground pollutants by sta-

2. As NJDEP explained, "[t]he criteria actually used by NJDEP in its review of Saint Lawrence's proposed new stationary sources are not in dispute.... NJDEP examined the Saint Lawrence Cement application to ensure that the operation of the facility's equipment would not cause or significantly contribute to a violation of the NAAQS, and that the health risks of hazardous and carcinogenic substances would be at negligible levels." NJDEP Br. at 11.

tionary facilities, pursuant to federal and New Jersey state regulations. *See* 40 C.F.R. § 70 *et seq.;* N.J. Admin. Code tit. 7, § 1 *et seq.*

40. Based on its projected activities, SLC was required to apply to different offices of the NJDEP for several different types of permits. SLC applied for: (1) a Waterfront Development Permit, from the NJDEP Office of Sediment and Dredging Technology; (2) a Pollutant Discharge Elimination Permit, from the NJDEP Water Quality Division; (3) several "general permits" governing handling and storage of materials; and (4) air quality permits for each of the five stationary emission sources SLC planned to operate, from the NJDEP Air Quality Permitting Program. Pomar Cert. at ¶ 8, Exh. E, F; Montag Decl., Exh. G, H.

41. The primary pollutants to be produced by the SLC facility will be emitted into the air. Diosey Decl. at ¶ 4. These pollutants include particulate matter (dust), mercury, lead, manganese, nitrogen oxides, carbon monoxide, sulfur oxides, and volatile organic compounds. Diosey Decl., Exh. D(4).

42. Because the most significant source of pollutants produced by the SLC facility will be airborne emissions from stationary sources, the focus of SLC's application, and of the NJDEP's review, was on SLC's air permit applications. *See* Diosey Decl. at ¶ 4 and Exh. B, C, D.

43. The NJDEP Air Quality Permit Program Office is responsible for reviewing and approving permits for stationary sources of air pollutants. The requirements and the application process for air permits are set forth at N.J. Admin. Code tit. 7, § 7:27–8.1–28.

44. SLC submitted its air permit applications to the NJDEP Air Quality Permit Program Office on August 5, 1999. The permit applications, which are several hundred pages long, include narrative text, a site plan, diagrams of various parts of the facility, facility emission estimates for each of the emission stacks, and a list of applicable state and federal regulations. Diosey Decl., Exh. B.

45. With its application, SLC was required to submit an air dispersion modeling protocol. The SLC air dispersion modeling proposal was based on an EPA-approved model which is capable of handling multiple layers of information. Diosey Decl. at ¶ 10. Modeling is used to predict the environmental impact of a pollutant emission source, such as the proposed SLC facility, by estimating emission flow based on air patterns and other meteorological data. "The modeling predicts ambient air concentrations downwind from the source of the emissions, meteorological conditions-including wind speed and wind direction, temperature, and turbulence in the atmosphere—buildings, and other man-made and natural influences." Diosey Decl. at ¶ 7. The results of the modeling are then compared to the NAAQS to determine whether a particular facility will cause or significantly contribute to a violation of the NAAQS. Diosey Decl. at ¶ 8.

46. The NJDEP approved the modeling protocol selected by SLC. Diosey Decl. at ¶ 10, Exh. C.

### I. *Waterfront South*

47. Waterfront South is a neighborhood located in the City of Camden, New Jersey. Waterfront South corresponds to United States Census Tract 6018. Pomar Cert., Exh. A. The population of Waterfront South consists of 2,132 people, approximately 41% of whom are children. Pomar Cert., Exh. A, K. There are approximately 464 households in Waterfront South. Pomar Cert., Exh. A.

48. The most recent census figures available, from the 1990 census, reveal that 91% of the residents of Waterfront South are persons of color. Specifically, 63% are African–American, 28.3% are Hispanic, and 9% are non-Hispanic White. Pomar Cert. at ¶ 2, Exh. A.

49. In 1990, the median household income of residents of Waterfront South was $15,082, and the per capita income was $4,709. Over 50% of the residents of Waterfront South live at or below the federal poverty level. Pomar Cert. at Exhs. A, N.

50. Waterfront South is located in the City of Camden, which is part of Camden County, New Jersey. According to 1990 census figures, the residents of Camden County are 75.1% non-Hispanic white, 16.2% African–American, and 7.2% Hispanic. Pomar Cert., Exh. A.

51. In 1990, the median household income of residents of Camden County was $40,027, and the per capita income was $15,773. *Id.*

52. Camden County is one of twenty-one counties in the State of New Jersey. The residents of the State of New Jersey are 79.4% non-Hispanic white and 20.6% non-white. Pomar Cert., Exh. A; Gelobter Cert. at ¶ 15.

53. Many pollutant-producing municipal and industrial facilities are located in or near Waterfront South. Pomar Cert., Exh. D, Exh. K; Montag Decl., Exh. C.

54. Municipal or County facilities in the area include: (1) the Camden County Municipal Utilities Authority ("CCMUA") sewage treatment plant, which treats sewage for approximately 35 municipalities in Camden County; (2) the Camden County Resource Recovery facility, a trash-to-steam incinerator; and (3) the Camden Cogen Power Plant, a cogeneration facility, which is an industrial facility that converts waste energy to produce heat or electricity. Pomar Cert., Exh. D.

55. Industrial facilities located in or near Waterfront South include the Pneumo Abex Corporation, the G–P Gypsum Corporation, United Parcel Service, and the Coastal Eagle Point Oil Company Refinery. Pomar Cert., Exh. D.

56. There are two Superfund sites located in Waterfront South. The first is the Welsbach/General Gas Mantle site, and consists of two abandoned factories and neighboring residential lots on Arlington Street. The site is contaminated with thorium and was discovered to be radioactive in 1981. The second is the Martin Aaron Drum Company site, which is located on Broadway. Pomar Cert., Exh. K at 1.

57. There are four sites within one-half mile of the proposed SLC facility that the EPA has identified and has already or is currently investigating for the release or threatened release of hazardous substances, including: (1) Kramer Chemicals, located at the intersection of Atlantic and Delaware Avenues; (2) Camden Gas Works, at the intersection of 2d and Spruce Streets; (3) the Front Street Warehouse, at 1229 Front Street; and (4) the Camden Coke Plant, on Front Street between Walnut and Kaighn Streets. Pomar Cert., Exh. K at 2.

58. The NJDEP has identified fifteen known contaminated sites in the Waterfront South neighborhood. These sites include, *inter alia:* (1) Camden Iron & Metal, located at the intersection of Front and Atlantic Streets; (2) Conrail, located on Chelten Ave.; (3) Lectronic Research Laboratories, at 1423 Ferry St.; (4) Consolidated Chemx Corp., located at 4th and Jefferson Streets; (5) Camden Lime, located at the intersection of South Front and Atlantic Ave.; (6) Atlantic Industrial Tank, at 212 Mechanic Street. Fourteen of these sites are currently active in the NJDEP's

site remediation program. Montag Decl., Exh. C at 25–26 (Hearing Officer's Report). The NJDEP is aware of the concentration of contaminated sites in this area and has dedicated a staff member to work directly with the City of Camden to facilitate clean-up and redevelopment. *Id.* at 25–26.

59. It is uncontested that, in addition to those sites listed above, all of which are subject to some federal or state regulation, there are numerous other industrial facilities in the area. These include: (1) four scrap yards on or near Ferry Avenue; (2) Jen Cyn Industries: (3) Lambertsky Poultry; and (4) four automotive shops. Montag Decl., Exh. K at 3.

60. The City of Camden recently commissioned a study of Waterfront South, and, after analyzing the study results, designated Waterfront South as "an area in need of redevelopment," pursuant to N.J.S.A. § 40A:12A–3. The study found that:

> Properties in [unsanitary, dilapidated or obsolete] condition are not only harmful to themselves, but also constitute a clear and present danger to the surrounding community.... Properties which are deleterious in their use, or are poorly arranged have-or threaten to-become safety and health hazards to their users as well as to those who come in contact (even incidentally) with such properties. Buildings and land which produce air, land or water pollution-particularly radiation-are prime examples of property uses which are detrimental to the community's welfare. Additionally businesses which generate excessive noise, dust, odors, etc. or cause immoderate vehicle traffic (especially trucks) which introduces safety hazards for pedestrians (especially children and the elderly) and other motorist; and such truck traffic which produce noise and vibrations harmful to the mostly residential structures found on unintended truck routes ... are examples not only of deleterious land uses but show how faulty or obsolete site design can prove harmful to the rest of the community.... The dense arrangement of buildings, the close proximity of residential and industrial uses, and unregulated truck traffic makes the spillover effects of noxious manufacturing or related industrial activity ... detrimental to surrounding property users and residents throughout Waterfront South.

Montag Decl., Exh. K at 4 n. 8.

**J.** ***The Health of the Community and the Effects of the SLC Facility on Health***

**(1) Current Health of the Community**

61. Plaintiffs claim that the health of the residents of Waterfront South is already poor, and that the proposed SLC facility will aggravate and adversely impact the health of the residents of Waterfront South in two specific ways: (1) through the facility's emissions of inhalable particulate matter; and (2) through the ozone which will be produced by the emissions of approximately 77,000 trucks traveling through Waterfront South annually to transport materials to and from the SLC facility.

62. To support their concerns regarding the current health status of the community with respect to the adverse implications of the proposed SLC's facility's operation, Plaintiffs have submitted the deposition of Dr. Irwin Berlin. Dr. Berlin was asked by the Community Advisory Board's Technical Advisory Group to study the health consequences of the proposed SLC facility. His report to the CAP was submitted to this Court by SLC. Smith Decl., Exh. R. Dr. Berlin is the only physician on the NJDEP's 40–member Environ-

mental Equity Council. He was appointed to that position in 1999 by NJDEP Commissioner Shinn. Berlin Dep. at 7, 31.

63. In his deposition testimony, Dr. Berlin testified that he had been asked by Morris Smith, Esq., consultant for SLC, on behalf of the CAP, to evaluate the overall SLC facility design and emission protections, with specific attention to particulate emissions. Berlin Dep. at 13. In the letter he submitted to Mr. Smith documenting his findings, Dr. Berlin identifies Camden County as a "Community of Concern" ("COC") based on initial findings of a study Dr. Berlin is currently performing regarding the bronchial and lung cancer and asthma rates of residents of New Jersey. Smith Decl., Exh. R at 3. The initial findings of Dr. Berlin's study, which are not challenged, indicate that in Camden County:

1) The age-adjusted cancer rate for black females is higher than 90% of the rest of the state;

2) The age-adjusted cancer rate for black males is higher than 70% of the rest of the state;

3) The rate of cancer is significantly higher for black males than for white males;

4) The age-adjusted rate of death of black females in Camden County from asthma is over three times the rate of death for white females from asthma in Camden County;

5) The age-adjusted rate of death of black males in Camden County from asthma is over six times the rate of death for white males from asthma in Camden County.

Smith Decl., Exh. R at 3; *see also* Berlin Decl. at ¶¶ 31–32.

64. Furthermore, the self-reported asthma rate for Waterfront South residents is 33%, more than twice the self-reported rate of asthma in other parts of the City of Camden. Montag Decl., Exh. K at 4. It is undisputed that as many as 61% of Waterfront South residents have problems coughing and catching their breath, compared to 36–39% of the residents in North Camden. *Id.* Finally, it is undisputed that 48% of the residents of Waterfront South report experiencing tightness in their chests as a symptom, as compared to 23% of the residents of North Camden. *Id.*

65. Neither the NJDEP Defendants, nor SLC, have disputed the deposition testimony of Dr. Berlin regarding the impact on the health of the community by the proposed SLC facility, nor have they disputed the conclusions contained in Dr. Berlin's letter to Mr. Smith.

### (2) Effects of PM Inhalation

66. Because inhalation of particulate matter is a known health hazard, the EPA has established a NAAQ standard for particulate matter emissions and also regulates facilities which emit PM–10. The currently enforceable NAAQ standard for PM–10 was set in 1987. *See* 40 C.F.R. § 50.

67. It is undisputed that, with all proposed emissions controls in place as stated in the permit applications, the SLC facility will emit 59.1 tons of particulate matter size PM–10 or smaller per year. Diosey Decl. at ¶ 4. The SLC facility will therefore be in compliance with the current NAAQ standard for PM–10 emissions.

68. Plaintiffs contend, however, that mere compliance with the NAAQ standard for PM–10 does not result in the avoidance of adverse health consequences for the residents of Waterfront South who will be exposed to the particulate emissions of the proposed SLC facility. Rather, Plaintiffs argue that: (1) when the totality of the

circumstances are considered, the addition of the SLC facility's PM–10 emissions to the existing environmental conditions in Waterfront South will have an adverse impact on the health of residents of Waterfront South; and (2) the portion of PM–10 emitted by the SLC facility which is composed of particulate matter 2.5 microns in diameter or smaller (PM–2.5), although it is not currently regulated by a NAAQ standard, will adversely affect the health of residents of Waterfront South.

69.   To support their argument that the SLC facility's particulate matter emissions will adversely impact the health of the residents of Waterfront South, Plaintiffs rely on: (1) the certification of Dr. Marc Lavietes, an Associate Professor of Pulmonary Medicine at the University of Medicine and Dentistry of New Jersey, concerning the adverse health impacts of PM–10 and PM–2.5 emissions; and (2) the EPA's findings in support of its 1997 decision to reduce the NAAQS for PM–10 and establish a NAAQ for PM–2.5 emissions. *See,* National Ambient Air Quality Standards for Particulate Matter; Final Rule, 62 Fed.Reg. 38652 (July 18, 1997)(to be codified at 40 C.F.R. § 50).

*PM–10*

70.   With respect to PM–10 emissions, Dr. Lavietes testified that there is a statistically significant relationship between PM–10 emissions and mortality, even where PM–10 emissions are *well below* the level set by NAAQS. Lavietes Cert. at ¶ 7. Dr. Lavietes based this conclusion on the results of a recent study conducted by researchers at Johns Hopkins University, published in the New England Journal of Medicine ("Hopkins Study"). *See* Lavietes Cert., Exh. B (Jonathan Samet, M.D., Francesca Dominici, M.D., Frank C. Curriero, M.D., Ivan Coursac, M.S., and Scott L. Zeger, Ph.D., *Fine Particulate Air Pollution and Mortality in 20 U.S. Cities,*

1987–1994, 343 NEW ENG. J. MED. 1742 (2000)).   According to this study, for every 10 microgram increase per cubic meter of PM–10 levels in a twenty-four hour period, the increase in relative rate of death from all causes was .51 percent, and the increase in rate of death from cardiovascular and pulmonary cases was .68 percent. Lavietes Cert. at ¶ 7.

71.   Furthermore, Dr. Lavietes testified that exposure to PM–10 is also related to morbidity, or incidence of disease. Specifically, Dr. Lavietes cited numerous studies which link high PM–10 concentrations to increased emergency room visits for asthma, impaired lung function, and the general state of respiratory health, particularly of children and the elderly. Lavietes Cert. at ¶ 10. Inhalation of fine particulate matter exacerbates pre-existing respiratory illness, such as asthma and emphysema, and can trigger asthma attacks. Lavietes Cert. at ¶¶ 12–17. It is also linked to other respiratory symptoms such as bronchitis, coughing, runny nose, and burning eyes. *Id.*

72.   Based on the results of the Hopkins Study, Dr. Lavietes estimates that the particulate matter emissions from the SLC facility will cause an increase in the overall death rate of over 1.2%, and an increase in cardiovascular and respiratory death rates of 1.6%, among persons who experience the maximum impact levels. Lavietes Cert. at ¶ 21.

73.   Finally, Dr. Lavietes testified that PM–2.5 is the portion of PM–10 which is most dangerous to human health. Lavietes Cert. at ¶ 11.

74.   The NJDEP has not submitted any expert testimony regarding the specific implications of the proposed SLC facility's particulate emissions on the health of the residents of the surrounding community. To support its contention that the pro-

posed SLC facility will not adversely affect the health of the residents of the surrounding community, the NJDEP relies exclusively on the fact that the emissions from the proposed facility will be within the 1987 EPA NAAQS for PM–10.

75. SLC has submitted the Certification of Dr. Laura Green, Ph.D., a lecturer at the Massachusetts Institute of Technology and President of Cambridge Environmental, Inc., to refute the testimony of Dr. Lavietes.

76. Dr. Green's testimony begins with a general assertion that the size of the dose of any particular toxin determines the risk which that toxin poses to human health. Green Cert. at ¶ 9. Dr. Green then challenges Dr. Lavietes' testimony on three major points. First, Dr. Green states that the particulate matter emission of the proposed SLC facility, because it is within the EPA NAAQS, is "safe" and will not adversely impact human health. Green Cert. at ¶ 18. Dr. Green relies on the NAAQS for this determination, stating that "[i]n setting the NAAQS for PM–10, the [EPA] reviewed hundreds of scientific, peer-reviewed studies. Agency scientists identified a concentration in air determined, by scientific study, to be the 'lowest adverse effect level,' and policymakers then divided that level by safety factors to settle on a lower level proposed as the standard. Ambient air meeting these standards is considered to be safe." *Id.*

77. Second, Dr. Green compares the health impact of the particulate matter which will be emitted by the proposed SLC facility to the health impact of exposure to crustal matter, or material from the earth's surface which is composed of soil and rock. Green Cert. at ¶¶ 20, 22. According to Dr. Green, crustal material functions similarly to particulate matter in the way it affects human health. *Id.* Dr. Green cites a recent study on the associa-

tion of particulate matter produced by various sources, including but not limited to crustal matter, with daily mortality in six U.S. cities, which concluded that daily death rates decreased as particulate matter increased. Green Cert. at ¶ 21 (*citing* F. Laden, L.M. Neas, D.W. Dockery and J. Schwartz, *Association of Fine Particulate Matter from Different Sources with Daily Mortality in Six U.S. Cities,* 108 ENVTL. HEALTH. PERSPECT. 941 (2000)). Based on this study and a 1999 study in which researchers concluded that dust storms in Spokane, Washington were not associated with increased mortality, Dr. Green concludes that there is no "reliable" basis for Dr. Lavietes' conclusion that the SLC facility's PM–10 emissions will result in a increase in the mortality of people exposed to its emissions. Green Cert. at ¶ 23.

78. Finally, Dr. Green contests Dr. Lavietes' findings with respect to the potential effect of the SLC facility's particulate matter emissions on asthmatics. Dr. Green cites several geographic studies regarding worldwide rates of asthma to support her assertion that "variations in outdoor air quality are not causally linked to variations in the prevalence of asthma." Green Cert. at ¶ 26. Furthermore, Dr. Green asserts that to the extent particulate matter can be linked to asthma, only very acidic particulate matter has been found to exacerbate asthma. Dr. Green notes that the SLC facility will emit non-acidic particulate matter. Green Cert. at ¶¶ 28–31. Dr. Green concedes that the same studies have shown a correlation between ambient particulate matter and asthma, but asserts that Dr. Lavietes' conclusions are based on "weak, inconsistent, and non-mechanically based correlations between tiny increments of particulate matter in air and some measures of asthma." Green Cert. at ¶ 35.

79. Plaintiffs are particularly concerned about the adverse health effects of a subset of the SLC facility's PM–10 emissions, namely, the emission of particulate matter size 2.5 microns or less, "PM–2.5". SLC estimated that "approximately half" of the emissions from the production of GGBFS are PM–2.5. Pomar Cert., Exh. M. The SLC's contribution of PM–2.5 would likely exceed the proposed EPA NAAQS for PM–2.5. Pomar Cert., Exh. M, Pomar Suppl. Cert. at ¶ 3, Exh. B; Lavietes Suppl. Cert. at ¶ 11, Exh. B.

80. In his certification, Dr. Lavietes testified that PM–2.5, because it is smaller, can lodge more deeply in the lungs than coarser components of PM–10. Dr. Lavietes also testified that it is the 'most dangerous component of PM–10, and is likely responsible for most of the negative health consequences associated with PM–10. Lavietes Cert. at ¶¶ 11, 19.

81. The NJDEP responds to Plaintiffs' concerns regarding the SLC facility's potential PM–2.5 emissions by emphasizing that there is currently no NAAQ standard for PM–2.5. NJDEP Br. at 13. Essentially, the NJDEP argues that unless and until the EPA issues a NAAQ standard for PM–2.5, the NJDEP cannot be held responsible for failing to consider whatever adverse health consequences might result from PM–2.5 exposure. The NJDEP maintains this position despite the fact that the NJDEP has noted that "ozone and particulates are New Jersey's two most pervasive air quality problems and more measures need to be taken to ensure that those health standards are attainted in future years." Pomar Cert. at ¶ 14, Exh. L at L–3.

82. The NJDEP is correct that there is currently no NAAQ standard for PM–2.5. Plaintiffs, in fact, do not dispute this fact, just as they do not dispute the fact that the proposed SLC facility's PM–10 emissions will be within the NAAQS for PM–10. Trans. of Oral Arg. at 11.

83. Yet the NJDEP's argument that it need not consider the adverse effects of PM–2.5 because the EPA has not defined PM–2.5 as dangerous and promulgated a NAAQS is disingenuous. As the NJDEP is well aware, on July 18, 1997, the EPA issued a final agency rule setting new NAAQS for particulate matter, and specifically setting NAAQS for PM–2.5. National Ambient Air Quality Standards for Particulate Matter; Final Rule, 62 Fed.Reg. 38652 (July 18, 1997)(to be codified at 40 C.F.R. § 50); *see also* Pomar Cert., Exh. K at K–9 (Report of Dr. Atay, Chief of the NJDEP Bureau of Air Quality Engineering) (noting that the EPA has promulgated NAAQS for PM–2.5 and that the NJDEP has begin to monitor PM–2.5 in anticipation of the new NAAQS). Stating that "[t]hese decisions are based on a thorough review ... of the latest scientific information on known and potential human health effects associated with exposure to PM at levels typically found in ambient air," the EPA explained that "[t]he most significant new evidence on the health effects of PM is the greatly expanded body of community epidemiological studies ... [which] provide 'evidence that serious health effects' (mortality, exacerbation of chronic disease, increased hospital admissions, etc.) are associated with exposures to ambient levels of PM found in contemporary U.S. urban airsheds even at concentrations below current U.S. PM standard." 62 Fed.Reg. 38652, 38655 (citation omitted).[3]

---

**3.** Specifically, the EPA recognized that ambient PM, alone and in combination with other pollutants, is associated with "premature mortality, aggravation of respiratory and cardiovascular disease (as indicated by increased hospital admission and emergency room visits, school absences, work loss days, and restricted activity days), changes in lung func-

84. The EPA specifically noted that "[s]ensitive subpopulations [ ] appear to be at greater risk to such effects, specifically individuals with respiratory disease and cardiovascular disease and the elderly (premature mortality and hospitalization), children (increased respiratory symptoms and decreased lung function), and asthmatic children and adults (aggravation of symptoms)." 62 Fed.Reg. 38652, 38656.

85. In reviewing the available scientific data documenting the adverse effects of PM–10 and PM–2.5 on human health, the EPA concluded that "these epidemiological findings cannot be wholly attributed to inappropriate or incorrect statistical methods, mispecification of concentration-effect models, biases in study design or implementation, measurement errors in health endpoint, pollution exposure, weather, or other variables, nor confounding of PM effects with effects of other factors." 62 Fed.Reg. 38652, 38656. This conclusion directly refutes the assertions of SLC's expert, Dr. Laura Green.

86. After several years of study and a comprehensive review of the available scientific literature on the correlation between PM inhalation and adverse health consequences, the EPA decided, *inter alia,* to implement a NAAQS for PM–2.5. *See* 62 Fed.Reg. 38652.

87. The EPA's decision to adopt a NAAQS for PM–2.5 was immediately challenged by industry and other groups, and several petitions were filed with the United States Court of Appeals for the District of Columbia seeking to enjoin the implementation of the new NAAQS for PM–10, as well as new NAAQS the EPA had issued for ozone at the same time. *See American Trucking Assoc., Inc. v. U.S.E.P.A.,* 175 F.3d 1027 (D.C.Cir.1999).

88. With respect to the new PM NAAQS, the Court of Appeals found "ample support for EPA's decision to regulate coarse particulate pollution above the 1987 levels." *Id.* at 1054. Furthermore, the Court upheld the EPA's decision to add a NAAQS for PM–2.5 based on its finding that PM–2.5 "pose[s] distinct threats to public health: the growing empirical evidence demonstrating a relationship between fine particle pollution and adverse health effects amply justifies establishment of new fine particle standards." *Id.* at 1055–56. The Court, however, concluded that the EPA's decision to regulate particulate matter larger than 2.5 microns in diameter (PM + 2.5) but smaller than 10 microns (PM–10) indirectly, through the continued regulation of PM–10, was unsupported by evidence in the record, arbitrary, and capricious. *Id.* at 1054. Essentially, the Court of Appeals found EPA's evidence that different adverse health consequences result from the inhalation of PM–2.5, and PM + 2.5(–10) persuasive, however, it decided that EPA's proposed methodology of continuing to regulate PM + 2.5(–10) through PM–10 standards was inadequate. *Id.* Therefore, the Court of Appeals vacated the EPA's new PM–10 NAAQS "because the EPA will have to develop different standards when it corrects the arbitrarily chosen PM[-]10 indicator." As to the PM–2.5 NAAQS, the Court "invited briefing on the question of remedy: possibilities include vacatur, non-vacatur subject to application to vacate, and non-vacatur." *Id.* at 1057.

89. The Court's decision was appealed to the Supreme Court, which granted *certiorari* in May, 2000. *See Browner v. American Trucking Associations, Inc.,* 529 U.S. 1129, 120 S.Ct. 2003, 146 L.Ed.2d 954 (2000). Neither party, however, petitioned

tion and increases respiratory symptoms, changes to lung tissues and structure, and

altered respiratory defense mechanisms." 62 Fed.Reg. 38652, 38656.

for review of the part of the Court of Appeals' decision specifically concerning the PM NAAQS. *See Whitman v. American Trucking Assoc., Inc.*, 531 U.S. 457, 121 S.Ct. 903, 149 L.Ed.2d 1 (February 27, 2001). Therefore, the Supreme Court did not address the PM NAAQS.

90. It is undisputed that the NJDEP relied entirely and exclusively on the federal NAAQ standard for PM–10 emissions in conducting its risk assessment with respect to the health hazards posed by the SLC facility's emission of PM–10 to the surrounding community. *See* NJDEP Br. at 11–12; Pomar Cert., Exh. H, I. The NJDEP asserts that emissions which are within the federal PM–10 NAAQS are *per se* not adverse. NJDEP Br. at 12, Transcript of Oral Argument, March 23, 2001, at 20. The NJDEP therefore equates its compliance with the current PM–10 NAAQ standard with meeting its obligation to Plaintiffs under the EPA's Title VI implementing regulations, codified at 40 C.F.R. § 7.35.

91. Neither NJDEP nor SLC disputes either the EPA's or Dr. Lavietes' conclusions regarding the hazards of PM–2.5. Instead, both Defendants rely on the fact that the implementation of these standards has been delayed by litigation and therefore they are not currently in effect, to support their contention that they are not adverse. SLC Br. at 55–56; NJDEP Br. at 12–13. Furthermore, SLC insists that the record does not adequately support Plaintiffs' assertion that as much as 50% of SLC's PM emissions will in fact be PM–2.5. SLC Br. at 54. Plaintiffs, however, base this estimation on SLC's own response to the Community Advisory Panel's Technical Advisory Group. *See* Pomar Cert. at ¶ 15 and Exh. M ("As discussed at our March 2, 2000 meeting, the majority of the emissions from the plant are of the ground GBFS. Based upon an analysis of the particle size distributions of the ground GBFS, the percentage of PM–2.5 within the PM–10 portion of the product is approximately half." *Id.*).

92. SLC's expert, Dr. Green, urges this Court to rely on EPA's PM–10 NAAQS in evaluating the health risks associated with PM inhalation because "in setting the NAAQS for PM–10 [in 1987], the Agency reviewed hundreds of scientific, peer-reviewed studies." Green Cert. at ¶ 18. Yet, as Dr. Lavietes points out, Dr. Green completely ignores the fact that the EPA went through exactly the same scientifically rigorous, exhaustive process again in 1997, when it reached the conclusion that the PM–10 standard set in 1987 and now in effect is inadequate to protect public health. Lavietes Cert. at ¶ 13.

93. In light of the comprehensive evidence placed before the Court by Plaintiffs regarding the dangers of PM–2.5 and the failure of Defendants to address or refute that evidence with medical or scientific evidence, I find the testimony of Dr. Lavietes to be more credible than that of Dr. Green, and that PM–2.5 poses unique dangers to human health.

**(3) Effects of Ozone**

94. Plaintiffs' second major complaint regarding the impact of the proposed SLC facility involves the emissions of nitrogen oxides and volatile organic compounds ("VOCS"). Both the facility and the approximately 77,000 diesel trucks that will traverse the Waterfront South neighborhood annually, delivering materials to and from the SLC facility, will emit these materials. Pomar Cert. at ¶ 6, Exh. C, Exh. K at K–11–12. Nitrogen oxide and VOCS are precursors to ozone; ozone is created when these materials combine with heat and sunlight. Pomar Cert., Exh. K at K–12.

95. Ozone and its precursors are hazardous to human health. Dr. Lavietes testified that diesel truck emissions, which produce PM–10, hydrocarbons, carbon monoxide, other toxic chemicals, are carcinogenic and aggravate respiratory ailments. Lavietes Cert. at ¶¶ 23–25. Ambient, or airborne, ozone aggravates respiratory ailments and causes irritation of the eyes, lungs and breathing passages. Lavietes Cert. at ¶ 23. Ground level ozone contributes to decline in pulmonary function and has been linked to cancer. *Id.* at ¶ 23.

96. As Dr. Atay, Chief of NJDEP's Bureau of Air Quality Engineering, explained, "[t]he impact of truck diesel emission was not included in the air quality analysis for the facility. This is because tailpipe emissions of vehicles regulated under Title II of the Clean Air Act are exempted by both federal and State rules from inclusion as secondary emissions from the facility." Pomar Cert., Exh. K at K–11.

97. According to the NJDEP's statistics, the County of Camden is in "severe" or "very severe" nonattainment, or noncompliance, with the ozone NAAQS. Pomar Cert., Exh. L at L–13. In fact, eighteen of New Jersey's twenty-one counties are in noncompliance with the 1987 ozone NAAQS. *Id.*

98. EPA promulgated new, more restrictive ozone NAAQS in 1997. National Ambient Air Quality Standards for Particulate Matter; Final Rule, 62 Fed.Reg. 38652 (July 18, 1997)(to be codified at 40 C.F.R. § 50). The new ozone NAAQS, like the new PM NAAQS which EPA issued at the same time, were challenged in litigation brought by industry groups against the EPA. *American Trucking Assoc., Inc. v. U.S.E.P.A,* 175 F.3d 1027 (D.C.Cir.1999), *rev'd in part and aff'd. in part, Whitman v. American Trucking Assoc.,* 531 U.S. 457, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). When the Court of Appeals for the District of Columbia issued its ruling in *American Trucking,* on May 14, 1999, vacating the proposed ozone NAAQS, NJDEP Commissioner Shinn issued the following press release:

> New Jersey was the first state to support the more protective, eight-hour standard. One need only look at the number of hospitalizations on high-ozone days to justify the higher standard. By forcing the reduction of smog-forming emissions, it will provide greater protection for some of our most vulnerable citizens: young children, the elderly, and those with respiratory and heart problems. We in New Jersey will not relent in our pursuit of cleaner air. We will continue to seek the emission reductions needed to achieve this health-based standard.

Atay Dep., Exh. P–3.

99. SLC, through the CAP TAG, commissioned a study of existing and carbon monoxide emissions along the truck route to be used by the SLC delivery trucks. Smith Decl., Exh. L. The study found that the SLC truck traffic would not cause an exceedence of the carbon monoxide NAAQS in the area. Smith Decl. at ¶ 18, Exh. L. The study did *not* analyze the impact of the SLC facility or the SLC truck traffic on ozone. *Id.*

100. In response to the Plaintiffs' concerns about the effects of the SLC diesel truck traffic on ozone levels, the NJDEP argues only that the Plaintiffs have not adequately demonstrated that the SLC facility's truck emissions will "significantly" contribute to ambient ozone. NJDEP Br. at 25.

101. Given the large volume of truck traffic which will be traveling to and from the SLC facility, NJDEP's failure to give any consideration whatsoever to the poten-

tial increase in ozone levels in an area which is in non-attainment with the existing Ozone NAAQS, I find NJDEP's argument to be disingenuous. In these circumstances, it is clear that ozone levels will only get worse, not better.

### K. The NJDEP's Evaluation of SLC's Permit Application

102. The only criterion used by the NJDEP in evaluating SLC's air permit applications in this case was whether, based on emission projections and modeling data, the facility meets the NAAQS established by EPA in 1987. Trans. of Oral Arg. at 23; see also NJDEP Br. at 12–13. If a proposed facility does not exceed the NAAQS, it will generally be permitted.

103. The NJDEP required SLC to model the proposed facility's emissions of four different materials: PM–10, lead, manganese, and radioactive material. SLC Br. at 12–16; Diosey Decl. at ¶ 16.

104. With all proposed emissions controls in place as stated in the permit applications, the SLC facility is projected to emit 59.1 tons of particulate matter size PM–10 or smaller per year. Because it will emit less than 100 tons of PM–10, the SLC facility is designate a "minor", as opposed to "major," facility under New Jersey law. Diosey Decl. at ¶ 4; N.J. Admin. Code tit. 7, § 27–8.1.

105. Using the air dispersion modeling protocol approved by the NJDEP, SLC modeled the environmental impact of the PM–10 emission from its proposed facility. The model allowed for the consideration of the following data: (1) PM–10 emissions from fugitive and stationary sources at the facility; (2) the proposed facility's land use and site characteristics, including building heights and widths; (3) hourly meteorological data, including five years of surface data from the Philadelphia International Airport; (4) PM–10 emissions from twenty different significant producers of PM–10 in the area, including the Camden County Municipal Waste Incinerator, the Camden Cogeneration Power Plant, Coastal Eagle Point Oil Refinery, PECO Energy Delaware Power Plant, PneumoAbex Corporation, G–P Gypsum Corporation, and the Sun Oil Company Philadelphia Refinery. Diosey Decl. at ¶ 10, Exh. C at 5–3 to 5–8.

106. The results of the modeling revealed that the PM–10 emissions generated by the proposed SLC facility would not exceed the NAAQS for PM–10 established by the EPA. Specifically, the NJDEP made the following findings based on the modeling: (1) the 24–hour impact results, which measure the maximum impact of SLC's PM–10 emissions when combined with the twenty additional PM–10 producing sources in the vicinity over a twenty-four hour period, indicate that together, these facilities will utilize 58% of the federal NAAQS for the area; (2) the annual impact results, which measure the maximum impact of SLC's PM–10 emissions when combined with the twenty additional PM–10 producing sources in the vicinity over the course of one year, indicate that together, these facilities will utilize approximately 65% of the federal NAAQS for the area. Diosey Decl. at ¶¶ 13–14.

107. Additionally, the NJDEP found that emissions from the SLC facility would consume 92% of the 24–hour PSD PM–10 increment. Based on this finding, the NJDEP determined that the SLC facility would not exceed the PSD for PM–10 NAAQS in the region. Montag Decl., Exh. C at 17.

108. SLC was not required to, nor did it, model the emissions of particulate matter 2.5 microns or less, or PM–2.5. As I explained earlier, PM–2.5 is a smaller component of PM–10. PM–2.5 is included in

any measurement of PM–10, however, SLC did not collect or analyze data which would indicate what percentage of SLC's PM–10 emissions is composed of PM–2.5 or less. Montag Decl., Exh. C at 17. Nonetheless, SLC estimates that "approximately half" of the PM–10 emissions which the proposed facility will generate will be PM–2.5 emissions. Pomar Cert., Exh. I. As I noted above, the EPA promulgated new NAAQS in 1997 which included a NAAQS for PM–2.5. *See* National Ambient Air Quality Standards for Particulate Matter; Final Rule, 62 Fed.Reg. 38652 (July 18, 1997)(to be codified at 40 C.F.R. § 50). These regulations were challenged by several industrial groups, and are currently under reconsideration by the EPA. Therefore, there are no current NAAQS for PM–2.5. In anticipation of the EPA regulations, however, NJDEP has begun to monitor PM–2.5 levels at nineteen different locations throughout the state. Montag Decl., Exh. C at 18.

109. Based on the modeling, SLC demonstrated that the proposed facility's emissions of lead, manganese, and radioactive materials would be within applicable state and federal requirements. Diosey Decl. at ¶ 16, Exh. D at 6–4 (lead and manganese); Montag Decl., Exh. C at 5. (radioactive material).

110. SLC was not required to obtain permits from NJDEP for the emissions generated by the truck traffic to and from the proposed facility. NJDEP permits only stationary source pollutants. Truck emissions, because they are produced by mobile sources, are monitored by the New Jersey Department of Motor Vehicles. Compliance is measured by annual individual tailpipe inspections and random roadside inspections. 42 U.S.C. § 7521 *et seq.;* N.J. Admin. Code tit. 7, § 27–15.1 *et. seq.* and N.J. Admin. Code tit. 7, § 27B–4.1 *et. seq.; see also* Trans. of Oral Arg. at 16.

## L. Public Comments on the NJDEP's Air Permits for the SLC Facility

111. A public hearing was held on August 23, 3000, at the Camden County Municipal Utilities Authority. An estimated 125 people attended the hearing, and thirty-one people commented. Montag Decl., Exh. C at 2; Pls.' Br. at 6. Dr. Iclal Atay ("Dr.Atay"), Chief of the NJDEP's Bureau of Air Quality Engineering, began with an overview of the proposed SLC facility and the NJDEP's permitting process. Murphy Decl., Exh. 1 at Da–1. Michael Davis ("Davis"), project manager of the proposed SLC facility, then offered a brief presentation on the Saint Lawrence Cement Company. Murphy Decl., Exh. 1 at Da 4–6. After Davis spoke, the floor opened for public comment with Dr. Atay moderating. *Id.* at Da–6.

112. During the public hearing, commentators expressed both support for and opposition to the proposed SLC facility. Several commentators commended SLC for its effort at involving the community in planning. *See, e.g.,* Murphy Decl., Exh. 1 at Da–9, Da–16, Da–18 to Da–19. Many commentators expressed environmental concerns about the addition of the facility's PM–10, PM–2.5., and other hazardous emissions to the number of pollutant-producing facilities and environmental contaminants already in the neighborhood. *See, e.g., id.* at Da–9, Da–11, Da–15 to Da–16.

113. The NJDEP responded to the comments and questions expressed at the public hearing with the issuance of a written report prepared by Dr. Atay. The report is approximately thirty-three pages long and is organized thematically. *See* Montag Decl. at Exh. C (NJDEP Hearing Officer's Report).

114. In the response to comments regarding environmental concerns beyond

the PM–10 NAAQS, Dr. Atay noted that: (1) concerns and complaints about noise and traffic are handled by county health departments, municipal health departments, and local police; (2) requests for a study of quality of life issues in Waterfront South would be forwarded to the City of Camden; and (3) requests for a study of neighborhood health would be forwarded to the Department of Health. Hearing Officer's Report at 5, 27.

115. Eleven commentators requested that the NJDEP consider the SLC permit applications in the context of pre-existing local environmental issues and health problems. Hearing Officer's Report at 24. In response, Dr. Atay explained that the modeling study indicated that the emissions from the SLC facility would not exceed the PM–10 NAAQS. *Id.* at 24–25, 31.

116. Of the sixty-four public comments which Dr. Atay specifically addressed in her report, twenty-three were made by Malcom Pirrie, consultant to SLC, and concerned technical questions and clarifications of the draft permit The NJDEP issued to SLC. *Id.* at ¶¶ 7–22, 24–31.

### M. Jurisdiction

117. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331,[4] and § 1343.[5]

---

**4.** Section 1331 provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

**5.** Section 1343 provides:

The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 or Title 42;

### N. The Governing Legal Standard for Preliminary Injunctive Relief

118. Plaintiffs have moved for a declaratory judgment and a preliminary injunction pursuant to Fed.R.Civ.P. 65. An injunction is an extraordinary remedy granted only in limited circumstances. *Instant Air Freight v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir.1989) (citation omitted). Before a District Court may grant preliminary injunctive relief in this Circuit, a court must weigh the following four factors: (1) the likelihood of the movant's success on the merits; (2) whether the movant will be irreparably injured if relief is not granted; (3) whether the party to be enjoined will suffer irreparable injury if the preliminary relief is granted; and (4) whether the public interest will be served by the preliminary injunctive relief. *See Doe v. Nat'l Bd. of Medical Examiners,* 199 F.3d 146, 154 (3d Cir.1999) (quoting *American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ.,* 84 F.3d 1471, 1477 n. 2 (3d Cir.1996)) (en banc); *In Re Arthur Treacher's Franchisee Litigation,* 689 F.2d 1137, 1143 (3d Cir.1982); *Association for Fairness, Inc. v. New Jersey,* 82 F.Supp.2d 353, 359 (D.N.J.2000) (Orlofsky, J.).

119. The Court notes that "[w]here factors of irreparable harm, in-

---

(2) To prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom, or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

*Id.* at § 1343(a).

terests of third parties and public considerations strongly favor the moving party, an injunction might be appropriate 'even though plaintiffs did not demonstrate as strong a likelihood of success on the merits.'" *Constructors Assoc. of Western Pennsylvania v. Kreps*, 573 F.2d 811, 815 (3d Cir.1978).

120. Plaintiffs have alleged four separate causes of action against the NJDEP Defendants. The First and Second Counts of the Complaint are based on Plaintiffs' allegation that Defendants, the NJDEP and Commissioner Shinn, violated Plaintiffs' civil rights under Title VI of the Civil Rights Act of 1964 by permitting the construction and operation of the SLC facility. The Third Count of the Complaint alleges that the decision by Defendants, the NJDEP and Commissioner Shinn, in approving SLC's permit application, violated Plaintiffs' right to equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution. The Fourth Count alleges that Defendants, the NJDEP and Commissioner Shinn, violated the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*

121. Plaintiffs allege that the NJDEP's decision to grant SLC's permit applications to construct and operate the proposed facility constitutes intentional discrimination on the basis of race, color, and national origin. Plaintiffs allege that the NJDEP and Commissioner Shinn violated section 601 of Title VI of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000d. Section 601 provides that:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program

or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

122. Plaintiffs also allege that the NJDEP's decision to permit the SLC facility constitutes disparate impact discrimination in violation of the EPA regulations enacted pursuant to section 602 of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000d–1. Section 602 provides that:

> Each federal agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken.

42 U.S.C. § 2000d–1.

123. Plaintiffs' Equal Protection Claim alleges that by permitting the proposed SLC facility, the NJDEP and Commissioner Shinn intentionally discriminated against Plaintiffs on the basis of their race, color, or national origin, in violation of the Equal Protection Clause of the Fourteenth Amendment. U.S. Const. Amend. XIV. The Equal Protection Clause of the Fourteenth Amendment provides that: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." *Id.*

124. Plaintiffs' Fair Housing Act claim alleges that by permitting the SLC facility, the NJDEP and Commissioner Shinn caused a diminution in the quality and quantity of the available housing stock in Waterfront South, thereby violating Title VIII of the Civil Rights Act of 1964. Title

VIII, codified at 42 U.S.C. § 3601 *et seq.*, provides, in relevant part, as follows:

> [I]t shall be unlawful
>
> (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.
>
> (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

125. Plaintiffs briefed their Title VI claims in detail but did not brief their Equal Protection or Title VIII claims. At oral argument, counsel for Plaintiffs indicated that Plaintiffs' application for preliminary injunctive relief is based primarily on their Title VI claims and particularly on Plaintiffs' claim that the NJDEP's permitting decision will disparately impact Plaintiffs based on their race, in violation of section 602 of Title VI. Trans. of Oral Arg. at 3. Counsel for the Plaintiffs stated, however, that the same set of facts which Plaintiffs alleged in support of their section 602 claim would support their Equal Protection and Title VIII claims as well. *Id.*

126. Because Plaintiffs represented that their section 602 claim is their primary basis for relief, I shall base my decision on whether or not to grant preliminary injunctive relief on an analysis of this claim. Applying the standards established by the Third Circuit for the granting of preliminary injunctive relief, I must first determine whether the Plaintiffs have demonstrated a "likelihood of success on the merits" of their section 602 claim.

## O. *Likelihood of Success on the Merits*

127. To prevail on a motion seeking preliminary injunctive relief, the moving party must first show a "reasonable probability of eventual success in the litigation." *In Re Arthur Treacher's* 689 F.2d at 1143. To satisfy this standard, "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a prima facie case showing a reasonable probability that it will prevail on the merits." *Assisted Living Assoc. of Moorestown, LLC. v. Moorestown Tp.,* 996 F.Supp. 409, 433 (D.N.J.1998) (Orlofsky, J.) (citing *Oburn v. Shapp,* 521 F.2d 142, 148 (3d Cir.1975)).

128. Plaintiffs allege a claim of discrimination based on the disparate impact of the NJDEP's permitting decisions. Plaintiffs ground this claim in section 602 of Title VI of the Civil Rights Act of 1964. As I noted previously, section 602 authorizes federal agencies to enact regulations to implement section 601 of Title VI, which forbids any agency, which receives federal funds, from discriminating in the provision of services to persons based on race. 42 U.S.C. § 2000d–1.

129. In order to evaluate the likelihood that Plaintiffs will succeed on the merits of their claim, I must first consider whether Title VI authorizes a private right of action. If a private right of action exists, I must next consider the likelihood that Plaintiffs will prevail on the merits of their claims. I shall first consider Plaintiffs' request for a declaratory judgment that the NJDEP violated section 602 of Title VI, and the EPA's implementing regulations to that section, codified at 40 C.F.R. § 7.1 *et seq.,* by failing to consider the potential adverse, disparate impact of its

permitting decision with respect to the proposed SLC facility. Second, applying Title VI disparate impact analysis, I must evaluate the likelihood that Plaintiffs will succeed on the merits of their Title VI claim by deciding whether they have carried their burden of establishing a prima facie case of disparate impact discrimination in violation of Title VI.

### P. The Existence of a Private Cause of Action Under section 602 of Title VI

■ 130. Plaintiffs' claim under section 602 is predicated on the theory that a private cause of action may be implied under Title VI. The precise question of whether a private right of action may be implied under Title VI is currently pending before the United States Supreme Court. *See Sandoval v. Hagan,* 197 F.3d 484 (11th Cir.1999), *cert. granted,* 530 U.S. 1305, 121 S.Ct. 28, 147 L.Ed.2d 1051 (2000). *Sandoval* involved a suit brought by non-English-speaking residents of Alabama, who alleged that the state of Alabama Department of Public Safety's policy of administering its driver's licensing examination only in the English language resulted in disparate impact discrimination against them on the basis of their national origin, in violation of Title VI. *Id.* The United States District Court for the Middle District of Alabama found that the State's policy created a discriminatory disparate impact on the basis of national origin. *Sandoval v. Hagan,* 7 F.Supp.2d 1234 (M.D.Ala.1998). Therefore, the District Court granted Plaintiffs' motion for a permanent injunction enjoining the State of Alabama from continuing its English-only driver's licensing policy and ordered the state to make reasonable accommodations for non-English speakers who applied for a driver's license. *Id.* The State of Alabama appealed, arguing, *inter alia,* that the plaintiffs' suit should fail because

Section 602 of Title VI does not create a private right of action. After a lengthy examination of Title VI jurisprudence, the Eleventh Circuit affirmed the District Court, holding that Title VI created an implied private right of action to enforce federal regulations prohibiting disparate impact discrimination against statutorily protected groups. *Sandoval,* 197 F.3d at 501–507. The State of Alabama petitioned for a writ of *certiorari.* The United States Supreme Court granted *certiorari* on September 26, 2000. *See* 121 S.Ct. 28, 530 U.S. 1305, 147 L.Ed.2d 1051 (2000).

131. The United States Court of Appeals for the Third Circuit has ruled on the question of whether Title VI created an implied right of action in two recent cases. First, in *Chester Residents Concerned for Quality Living v. Seif,* 132 F.3d 925 (3d Cir.1997), the Third Circuit held that residents of the City of Chester, Pennsylvania had the right, under Title VI, to sue the Pennsylvania Department of Environmental Protection for permitting the construction and operation of an industrial facility in a predominantly black community. The Third Circuit concluded that Title VI does support an implied private cause of action for plaintiffs alleging disparate impact discrimination in violation of section 602. *Id.* at 937. The Commonwealth of Pennsylvania appealed, and the United States Supreme Court granted *certiorari.* 524 U.S. 915, 118 S.Ct. 2296, 141 L.Ed.2d 156 (1998). The builder of the proposed industrial facility then withdrew the challenged permit applications. Thereafter, the Supreme Court dismissed its grant of *certiorari* as moot and vacated the decision of the Third Circuit. 524 U.S. 974, 119 S.Ct. 22, 141 L.Ed.2d 783 (1998).

132. The Third Circuit, however, revisited the question of whether Title VI grants an implied private right of action in *Powell v. Ridge,* 189 F.3d 387 (3d Cir.

1999), *cert. denied,* 528 U.S. 1046, 120 S.Ct. 579, 145 L.Ed.2d 482 (1999). *Powell* was decided after the Supreme Court vacated the Third Circuit's decision in *Chester.* In *Powell,* the Third Circuit explicitly reaffirmed its conclusion in *Chester* that there is an implied right of action under section 602 of the Title VI of the Civil Rights Act. *Powell,* 189 F.3d at 397–400. *Powell* is currently the law in this Circuit.

133. The NJDEP Defendants do not contest the existence of a private right of action under Title VI.

134. Defendant–Intervenor SLC concedes that the Third Circuit's decision in *Powell* and a recent decision of this Court, *Bryant v. New Jersey Dep't of Transp.,* 987 F.Supp. 343, 348 (D.N.J.1998), support the argument that an implied private right of action exists under Title VI. SLC's Br. at 40–41 n. 23. Nonetheless, SLC asserts that it "expects that the Supreme Court will find that there is no private right of action under § 602." SLC Br. at 40–41. Until the Supreme Court renders its decision in *Sandoval,* however, this Court is bound by the Third Circuit's decision in *Powell.*

135. Under the law of this Circuit, then, section 602 of Title VI creates an implied private right of action which allows Plaintiffs to seek preliminary injunctive relief against the NJDEP Defendants on a theory of disparate impact discrimination in the administration of a federally funded program.

136. Having concluded that Plaintiffs are entitled to assert a private cause of action under section 602 of Title VI, I must now consider the Plaintiffs' likelihood of success on the merits of this claim.

## Q. *Declaratory Judgment on the Requirements of Title VI Implementing Regulations*

■ 137. This case presents the novel question of whether a recipient of EPA funding has an obligation under Title VI to consider racially discriminatory disparate impacts when determining whether to issue a permit, in addition to compliance with applicable environmental standards. For the reasons set forth below, I conclude that on the facts of this case, the NJDEP had such an obligation and failed to discharge it.

138. Plaintiffs seek a declaration that Title VI imposes an obligation on recipients of EPA funding, such as the NJDEP, to ensure that their permitting criteria and methods do not create or contribute to an existing adverse, disparate impact on persons based on their race, color, or national origin. This Court has chosen to address Plaintiffs' request for declaratory judgment within the context of its request for a preliminary injunction for the sake of clarity, because the question of whether the NJDEP has an obligation under Title VI must be answered before this Court can logically determine whether it discharged that obligation. This Court acknowledges that its decision to grant or deny declaratory relief is independent of its preliminary injunction analysis.

139. All entities which receive EPA financial assistance must submit an assurance to the EPA with their application that they will comply with the requirements of EPA's regulations implementing Title VI. 40 C.F.R. § 7.80.[6]

---

**6.** 40 C.F.R. § 7.80, provides, in relevant part, as follows:
  (a) Assurances—
  (1) General. Applicants for EPA assistance shall submit an assurance with their applica-

tions stating that, with respect to their programs or activities that receive EPA assistance, they will comply with the requirements of this Part. Applicants must also submit any other information that the OCR determines is

140. Defendants, SLC and the NJDEP, argue that by basing its permitting decisions on existing environmental emissions standards, such as the NAAQS, the NJDEP has complied with its obligations under Title VI. To support their arguments, the NJDEP and SLC cite various EPA administrative law sources which they claim stand for the proposition that compliance with federal environmental law standards is equivalent to compliance with Title VI.

141. For the reasons I shall now set forth, this Court rejects Defendants' proposed interpretation of the NJDEP's obligations under 40 C.F.R. § 7.10 *et seq.*, the EPA's implementing regulations to Title VI.

142. There are several sources of law and administrative guidance that undercut Defendants' argument.

143. First, the plain language of both Title VI and the EPA's specific implementing regulations contravenes the Defendants' interpretation of the law. Section 602 of Title VI clearly authorizes federal agencies, such as the EPA, to promulgate regulations implementing Section 601. *See* 42 U.S.C. § 2000d–1. Section 601 explicitly mandates that "no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

144. Pursuant to section 602, the EPA promulgated implementing regulations in 1973, which are codified at 40 C.F.R. § 7.10 *et seq. See* 38 Fed.Reg. 17968 (1973). These regulations were amended in 1984. 49 Fed.Reg. 1656 (1984).

necessary for preaward review. The applicant's acceptance of EPA assistance is an

145. Subpart B of the amended regulations is titled, "Discrimination Prohibited on the Basis of Race, Color, National Origin or Sex." 40 C.F.R. § 7.30. The first section under Subpart B is a general prohibition which explicitly forbids any "program or activity" which receives "EPA assistance" from excluding from participation in, denying the benefits of, or subjecting to discrimination any person on the basis of race, color, or national origin. 40 C.F.R. § 7.30.

146. Following this general prohibition, the EPA regulations promulgated pursuant to the EPA's authority to implement Title VI, section 602, include the following "specific prohibitions" cited here in relevant part:

(b) A recipient shall not use criteria or methods of administering its program which have the effect of subjecting individuals to discrimination because of their race, color, national origin, or sex, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program with respect to individuals of a particular race, color, national origin, or sex.

(c) A recipient shall not choose a site or location of a facility that has the purpose or effect of excluding individuals from, denying them the benefits of, or subjecting them to discrimination under any program to which this part applies on the grounds of race, color, or national origin or sex; or with the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of this subpart.

acceptance of the obligation of this assurance and this Part. 40 C.F.R. § 7.80.

(d) The specific prohibitions of discrimination enumerated above do not limit the general prohibition of §§ 7.30. 40 C.F.R. § 7.35.

147. The EPA has specifically interpreted Title VI to prohibit recipients of EPA funding from utilizing "criteria and methods" which have the "purpose or effect" of discrimination against individuals based on their race, color, or national origin. 40 C.F.R. § 7.35(b). Furthermore, the EPA eliminated any possible doubt that its Title VI implementing regulations apply to permitting decisions by recipients, such as the NJDEP, by specifically extending Title VI prohibitions to permitting decisions. 40 C.F.R. § 7.35(c).

148. The second source that undercuts Defendants' argument that it satisfied its obligation under Title VI by examining whether existing emission standards would be violated is Executive Order No. 12,898, entitled "Federal Actions to Address Environmental Justice In Minority Populations and Low–Income Populations." 59 Fed. Reg. 7629 (February 16, 1994), reprinted as amended 42 U.S.C. § 4321. Issued by President Clinton in 1994, the Order states that "[t]o the greatest extent practicable and permitted by law ... each Federal agency shall make achieving environmental justice part of its missions by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies and activities on minority populations [in the United States]". *Id.* at § 1–101. This Executive Order was intended only to "improve the internal management of the executive branch" and was not "intended to, nor [did] it create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law or equity by any party." *Id.* at § 6–609. Therefore, this Court relies on this Order only to the extent that it clarifies the federal government's understanding of Title VI.

149. The third source is the EPA's own interpretation of Title VI as expressed in the EPA's implementing regulations codified at 40 C.F.R. § 7.10 *et seq.* The EPA has determined that Title VI imposes an affirmative obligation on funding recipients to include consideration of Title VI criteria in their permitting decisions. The Court reaches this conclusion after a careful review of the EPA publications on which all three parties rely in reaching their opposing conclusions. Those publications are discussed below.

150. Both Plaintiffs and the NJDEP direct the Court's attention to the Draft Title VI Revised Guidance for Investigating Title VI Administrative Complaints ("Draft Revised Investigation Guidance") and the Draft Title VI Guidance for EPA Assistance Recipients Administering Environmental Permitting Programs ("Draft Recipient Guidance") (together, "Draft Guidances"). *See* Draft Revised Investigation Guidance and Draft Title VI Guidance for EPA Assistance Recipients Administering Environmental Permitting Programs, 65 Fed.Reg. 39650 (June 27, 2000). The Court recognizes, as do the parties, that neither of the Draft Guidances are final and, therefore, neither is binding on this Court. Instead, the Court considers these Draft Guidances only to the extent necessary to understand the EPA's developing interpretation of a recipient's duties under Title VI.

151. The Draft Revised Investigation Guidance is intended to provide a framework for the EPA's processing of Title VI complaints filed with the Agency. 65 Fed. Reg. 39650, 39668. This Guidance lays out a seven-step process which the EPA's OCR will use to evaluate complaints. With respect to whether the EPA will consider compliance with environmental

laws as equivalent to compliance with Title VI, the Draft Revised Investigation Guidance specifically states:

> Compliance with environmental laws does not constitute *per se* compliance with Title VI. Frequently, discrimination results from policies and practices that are neutral on their face, but have the effect of discriminating ... [T]here may be instances in which environmental laws do not regulate certain concentrations of sources, or take into account impacts on some subpopulations which may be disproportionately present in an affected population. For example, there may be evidence of adverse impacts on some subpopulations (e.g., asthmatics) and that subpopulation may be disproportionately composed of persons of a particular race, color, or national origin. Title VI is concerned with how the effects of the programs and activities of a recipient are distributed based on race, color, or national origin. *A recipient's Title VI obligation exists in addition to the Federal or state environmental laws governing its environmental permitting program.*

65 Fed.Reg. 39650, 39680 (emphasis added).

The NJDEP, without acknowledging the preceding language, quotes the section of the Draft Revised Investigation Guidance which immediately follows the language above, where the Guidance describes the role of the NAAQS in assessing Title VI compliance:

> If an investigation includes an allegation raising air quality concerns regarding a pollutant regulated pursuant to a primary NAAQS, and where the area in question is attaining that standard, the air quality in the surrounding community will generally be considered presump-

tively protective and emissions of that pollutant should not be viewed as 'adverse' within the meaning of Title VI. However, if the investigation produces evidence that significant adverse impacts may occur, this presumption of no adverse impact may be overcome.

65 Fed.Reg. 39650, 39680.

When considered as a whole, it is clear from this section of the Draft Revised Investigation Guidance that the EPA, when investigating Title VI complaints, will consider a recipient's compliance with NAAQ standards as evidence of its compliance with Title VI, but, significantly, such compliance is not conclusive or determinative evidence. The Court's reading of this section of the Guidance is corroborated by the EPA's footnote to this section, in which it reiterates that:

> [E]ven if an area is in compliance with the NAAQS for a criteria pollutant, there still may be Title VI concerns related to other criteria pollutants, to toxic hot spots associated with hazardous air pollutants under section 112 of the Clean Air Act, or to pollutants from other media.

65 Fed.Reg. 39650, 39681 n. 130.

152. The Draft Recipient Guidance, which was issued in tandem with the Revised Draft Investigation Guidance, lends further support to this Court's conclusion that compliance with Title VI requires consideration of adverse, disparate impacts caused by permitting decisions and may, therefore, require more than mere compliance with the NAAQS. The Recipient Guidance was "written at the request of the states and is intended to offer suggestions to assist state and local recipients in developing approaches and activities that address Title VI concerns." [7] 65 Fed.Reg.

---

7. Specifically, the Guidance suggests three

"approaches" which recipients might consid-

39650, 39651. The Draft Recipient Guidance is explicitly clear that recipients are not required to follow the suggestions contained in the Draft Recipient Guidance, nor are they required by the Draft Recipient Guidance to adopt any specific Title VI "approaches and activities" at all. *Id.* The Guidance states, however, that "[w]hile [recipients] are not required to implement the Title VI activities or approaches described in this guidance, [recipients] are required to operate [their] programs in compliance with the non-discrimination requirements of Title VI and EPA's implementing regulations" [40 C.F.R. § 7.1 et seq.]. 65 Fed.Reg. 38950, 39657. The fact that the EPA has drafted a Guidance to assist states in complying with Title VI, and the substantive content of the Guidance, reinforce the Court's conclusion, based on the implementing regulations and the Revised Draft Investigation Guidance, that NJDEP is required by law to consider the Title VI implications of its permitting decisions.

153. The fourth source that undercuts Defendants' theory is the only decision the EPA OCR has issued to date on a Title VI complaint. This decision resulted from a challenge to proposed construction of a steel plant in Flint, Michigan. *See* U.S. EPA OCR Investigative Report for Title VI Administrative Complaint File No. 5R–98–R5 ("*Select Steel Investigative Report*" or "*Select Steel*"). The *Select Steel* Complaint was filed with the EPA on August 17, 1998, by Father Phil Schmitter and Sister Joanne Chiaverini, alleging that the Michigan Department of Environmental Quality ("MDEQ") violated Title VI by permitting the construction of a steel plant in a community which was primarily African–American and already disproportionately burdened with significant pollution-producing facilities. *Id.* at 3. Specifically, the complaint alleged that MDEQ violated Title VI when it issued a "Prevention of Significant Deterioration" ("PSD") permit to the Select Steel Corporation. The Complainants alleged that the proposed steel plant would have a disparate impact on the surrounding, minority community by exposing the community to VOCS, lead, manganese, mercury and dioxin. The population in the community of the proposed site was 55.2% minority, in comparison with the statewide average of 17.6%. *Id.* at 13–14.

154. In evaluating the *Select Steel* Complaint, the EPA OCR followed a five-step analysis it published in the 1998 Draft Investigative Guidelines, which were a precursor to the 2000 Revised Draft Investigation Guidelines. Specifically, the EPA

er adopting as part of a strategy to address Title VI-related claims and issues that arise in the environmental context: (1) a comprehensive approach, which would integrate some or all of the methods described in the following "Activities" section; (2) an area-specific approach, wherein the recipient would identify geographic areas where adverse disparate health impacts and/or other Title VI concerns might exist and work with those communities to develop a strategy for addressing the Title VI concerns; and/or (3) a case-by-case approach, wherein the recipient would develop "general criteria to evaluate permits [to] highlight those permit actions that are likely to raise Title VI concerns," and/or complete a Title VI analysis once concerns are actually raised about a specific permit. 65 Fed.Reg. 39650, 39656. Furthermore, the Guidance identifies seven different activities which EPA recommends recipients consider implementing as part of permitting programs to help "identify and resolve issues that could lead to the filing of Title VI complaints." 65 Fed. Reg. 39650, 39657. These activities include: (1) training staff on Title VI obligations; (2) encouraging effective public participation and outreach; (3) conducting adverse impact and demographic analysis; (4) encouraging intergovernmental involvement; (5) participating in alternative dispute resolutions; (6) reducing or eliminating the alleged adverse disparate impact(s); and (7) evaluating Title VI activities. 65 Fed.Reg. 39650, 39657–39663.

OCR considered the following data: (1) the proposed facility's emissions, including NAAQ-regulated emissions and non-NAAQ-regulated emissions; (2) the existing level of air toxics in the area, based on data from the EPA's Toxic Release Inventory (TRI); [8] and (3) health data, including children's lead blood-levels from the community where the proposed facility was to be located. Only after evaluating this data did the EPA OCR conclude that the operation of the proposed facility would not adversely affect the health of the residents of the surrounding community. The EPA then concluded that "[i]f there is no adverse affect from the permitted facility, there can be no finding of discriminatory effect which would violate Title VI and EPA's implementing regulations." *Id.*

155. Despite the obvious difference between its own approach and the comprehensive investigation undertaken by the OCR, which included consideration not only of NAAQS emissions, but also of community-specific health and environmental data, the NJDEP nonetheless contends that the following language from *Select Steel* supports its argument that it need not look beyond the NAAQS in evaluating a Title VI complaint:

> With respect to the NAAQS-covered pollutants ... the EPA believes that where, as here, an air quality concern is raised regarding a pollutant regulated pursuant to an ambient, health-based standard, and where the area is in compliance with, and will continue after the operation of the challenged facility to comply with, that standard, the air quality in the surrounding community is *presumptively protective* and emissions of that pollutant should not be viewed as "adverse" within the meaning of Title VI. By establishing an ambient, public health threshold, standards like the NAAQS contemplate multiple source contributions and establish a protective limit on cumulative emissions that *should ordinarily prevent an adverse air quality impact.*

*Select Steel Investigative Report* at 28 (emphasis added).

Consideration of the language which precedes the section quoted by the NJDEP shows that once again, the NJDEP has taken the EPA's statements out of context and thereby attempted to mischaracterize its obligations under Title VI. According to *Select Steel:*

> Title VI and EPA's implementing regulations set out a requirement *independent of the environmental statutes* that all recipients of EPA financial assistance ensure that they implement their environmental programs in a manner that does not have a discriminatory effect based on race, color, or national origin. *If recipients of EPA funding are found to have implemented their EPA-delegated or authorized federal environmental programs (e.g., permitting programs), in a manner which distributes the otherwise acceptable residual pollution or other effects in ways that result in a harmful concentration of those effects in racial or ethnic communities, then a*

---

8. The TRI is a list of approximately 650 chemicals which are used in a wide range of industrial facilities, including chemical, rubber, plastics, and petroleum refineries, food processing, electronics manufacturing, and other miscellaneous facilities. Industrial facilities which manufacture specific types of industrial products, and employ ten people or more, are required to report annual releases and transfers of chemicals which are on the TRI and which are manufactured, processed, or otherwise used above threshold amounts. TRI reports include separate information on releases to each environmental medium (e.g.air, water, land) and offsite transfers for treatment or disposal, as well as chemicals recycled, used in energy recovery, and present in waste streams. *Select Steel* at 23–24.

*finding of adverse disparate impact on those communities within the meaning of Title VI may, depending on the circumstances, be appropriate.*

*Select Steel* at 28 (emphasis added).

156. Based on the preceding review of the Draft Guidances and the EPA's analysis in *Select Steel,* I conclude that neither the Guidances, nor the *Select Steel* decision, support NJDEP's contention that it has no obligation to Plaintiffs under the EPA's Title VI implementing regulations, beyond ensuring SLC's compliance with the NAAQS. On the contrary, it is abundantly clear from my review of the EPA materials that the EPA construes the regulations to impose a burden on recipients of EPA funding, such as the NJDEP, to consider the potential adverse, disparate impacts of their permitting decisions which are independent of environmental regulations such as the NAAQS.

157. Finally, the NJDEP's insistence that its obligation to Plaintiffs under Title VI does not go beyond ensuring compliance with the NAAQS is completely undermined by the NJDEP's own recognition, in numerous fora, that it has precisely such an obligation under Title VI. On October 22, 1998, NJDEP Commissioner Shinn issued the first of several Administrative Orders acknowledging the NJDEP's obligation under Title VI. *See* Administrative Order No.1998–15 at *www.state.nj.us/dep/equity/ao98–15.htm* (visited March 27, 2001). In this Administrative Order, Commissioner Shinn established the NJDEP's "Advisory Council on Environmental Equity" ("Advisory Council"). *Id.* The NJDEP defined "environmental equity" as "the fair and equitable treatment in environmental decision-making of the citizens of all New Jersey communities regardless of race, color, income, or national origin. Fair and equitable treatment means that no population should bear disproportionate amounts of adverse health and environmental effects." Environmental Equity Defined, at *http:www.state.nj.us/dep/equity/define.htm* (visited March 27, 2001). The purpose of the Advisory Council is to "provide advice and guidance to the Commissioner and to assist the Department as it implements an environmental equity policy and a process." The Advisory Council was created "in recognition of state and federal concerns that minority and low-income populations may be experiencing a greater impact from pollution than other communities." *Id.*

158. Furthermore in early 2000, Commissioner Shinn issued Administrative Order 2000–01, which took effect immediately. Administrative Order 2000–01, at *www.state.nj.us/dep/equity/ao00–01.htm* (visited March 27, 2001). In this Administrative Order, Commissioner Shinn discussed responsibilities of the Advisory Council and identified "environmental equity implementation strategies" to be implemented by the NJDEP. Pursuant to these strategies, the NJDEP committed to: (1) work with the Advisory Council and permit applicants to identify mechanisms for community notification regarding application for new, modified, or renewal permits, as early as possible in the permit review process; (2) develop guidance for permit applicants for the administration of an effective environmental equity community outreach process; (3) establish a mechanism for community outreach at the earliest possible stage of the permit application process; (4) utilize technical screening tools such as the GIS and TRI to identify potential environmental equity issues at the earliest feasible stage of the permitting process; (5) participate in discussions among permit applicants and local community stakeholders and attempt, when possible, to include in permits condi-

tions that the permit applicants and community stakeholders have agreed upon; (6) facilitate ADR between permit applicants and stakeholders in the case of disputes; (7) work with permit applicants to facilitate accessibility, understanding, and transfer of technical and scientific data to local communities; and (8) provide ongoing environmental equity training to appropriate NJDEP managers and staff. *Id.* According to the NJDEP's website, this policy has been approved by the Advisory Council and is currently being "refined" in order to "ensure that the final product can be effectively incorporated into the permitting process." The Policy and Process, *www.state.nj/us/dep/equity/policy.htm* (visited March 27, 2001).

159. It is the Court's understanding that none of the policies or procedures referred to in the Administrative Orders have been implemented. Counsel for the NJDEP did not cite or otherwise describe or refer to any of the policies, the grant, or the administrative orders the Court has just described above. Indeed, when asked if she had any understanding of New Jersey's Environmental Equity Program, Dr. Atay, Chief of the NJDEP's Bureau of Air Quality Control and Hearing Officer for the SLC permit, stated that she had "none." Atay Dep. at 62. Dr. Atay confirmed that "no matter what is in [an applicant's permit] application, [she] and [the Bureau's permitting staff] would look only for information that's relevant to the question of would there or would there not be a violation of environmental law." *Id.* at 72–73.

160. Nevertheless, it is entirely clear from the Court's review of Commissioner Shinn's Administrative Orders that the NJDEP is aware that its obligations under Title VI extend beyond ensuring that permitted facilities do not violate environmental laws, and in fact include considering claims, such as Plaintiffs' in the present case, that a particular permit will result in an adverse, disparate impact in violation of Title VI.

161. From this Court's review of Title VI, the EPA's implementing regulations to Title VI, the EPA's administrative Guidances, the *Select Steel* decision, and NJDEP Commissioner Shinn's own administrative orders, this Court concludes that the NJDEP's interpretation of Title VI in the present case is not only erroneous, but would eviscerate the intent of Title VI, namely, to prevent agencies which receive federal funding from having the purpose or effect of discriminating in the implementation of their program on the basis of race, color, or national origin. 42 U.S.C. § 2000d–1. The NJDEP has not cited a single source of statutory, regulatory, or case law which supports its position, and this Court found none. Accordingly, I shall grant Plaintiffs' request for a declaratory judgment that the NJDEP and Commissioner Shinn have violated Title VI of the Civil Rights Act by failing to consider the potential adverse, disparate impact of the SLC facility's operation on individuals based on their race, color, or national origin, as part of the NJDEP's decision to permit SLC's proposed facility.

### R. Title VI Disparate Impact Analysis

162. In addition to declaratory relief, Plaintiffs also seek preliminary injunctive relief. Specifically, Plaintiffs ask this Court to rescind the permits which the NJDEP granted to SLC, and enjoin the NJDEP from issuing the SLC permits without first implementing a protocol for reviewing permit applications to ensure compliance with Title VI. Plaintiffs contend they are entitled to injunctive relief because they have established a likelihood of success on the question of whether the

operation of the proposed SLC facility will have an adverse, disparate impact on the Waterfront South Community based on the race, color, or national origin of the residents of that community.

163. The Supreme Court first identified a method for assessing claims alleging disparate impact in the context of claims of employment discrimination under Title VII of the Civil Rights Act of 1964. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In its 1974 decision in *Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974), the Supreme Court applied, without discussion, the disparate impact analysis articulated in *Griggs* to a claim brought under Title VI. *Lau* involved a suit brought by monolingual Chinese-speaking students in the California public school system who alleged that their schools' failure to provide them with educational opportunities violated Title VI. *Id.* The schools which the *Lau* plaintiffs attended received significant federal financial assistance, and were therefore subject to regulations which the U.S. Department of Health, Education, and Welfare had promulgated implementing Title VI. *See id.; see also* 45 C.F.R. § 80.3. The Court again considered the application of Title VI to disparate impact claims in its plurality decision in *Guardians Assn'n v. Civil Service Comm'n of the City of New York*, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983); however, because none of the plurality opinions in *Guardians Ass'n* commanded a majority, it was not until its decision in *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), that the Court conclusively held that federal agency regulations promulgated under Title VI could redress actions having a disparate impact on `minorities. *Alexander*, 469 U.S. at 293, 105 S.Ct. 712. *Alexander* involved the state of Tennessee's decision to reduce the number of inpatient hospital days the Tennessee

Medicaid program would pay hospitals on behalf of Medicaid recipients. A group of handicapped Medicaid recipients sued the state, alleging, *inter alia*, that this policy had a discriminatory effect on them in violation of anti-discrimination regulations promulgated by the Department of Health and Human Services, pursuant to the Rehabilitation Act. *See* 45 C.F.R. § 84.52(b)(4)(ii). Citing its decision in *Guardians*, the Court in *Alexander* held that "Title VI[ ] delegated to the agencies in the first instance the complex determination of what sorts of disparate impacts upon minorities constituted sufficiently significant social problems, and were readily enough remedial, to warrant altering the practices of the federal grantees that had produced these impacts." *Id.* at 293–94, 105 S.Ct. 712.

164. Following the Supreme Court's holdings in *Guardians Ass'n* and *Alexander*, federal courts have considered allegations of disparate impact discrimination in violation of Title VI based on, *inter alia*, implementing regulations enacted pursuant to Title VI by the Departments of Education and Transportation. *See, e.g., Powell v. Ridge*, 189 F.3d 387 (3d Cir. 1999), *cert. denied*, 528 U.S. 1046, 120 S.Ct. 579, 145 L.Ed.2d 482 (1999) (involving alleged disparate impact discrimination in violation of Title VI implementing regulations of the Department of Education, codified at 34 C.F.R. § 100.3(b)(2)); *Coalition of Concerned Citizens Against I–670 v. Damian*, 608 F.Supp. 110, 126 (S.D.Ohio 1984) (involving alleged disparate impact discrimination in violation of Title VI implementing regulations of the Department of Transportation and Federal Highway Administration, codified at 23 C.F.R. § 200.9 and 49 C.F.R. § 21.1 *et seq.*).

165. As the Third Circuit recently noted, "[a]lthough the Supreme Court has not yet spoken on the issue, the courts of

appeal have generally agreed that the parties' respective burdens in a Title VI case should follow those developed in Title VII cases." *Powell*, 189 F.3d at 393 (citations omitted).

■ 166. According to the Third Circuit's decision in *Powell*, in a case involving alleged disparate impact discrimination in violation of Title VI, the plaintiffs bear the initial burden of establishing a *prima facie* case that a facially neutral practice has resulted in a racial disparity. *Powell*, 189 F.3d at 393. The plaintiff must demonstrate, by a preponderance of the evidence, that the disputed practice detrimentally affects persons of a particular race to a greater extent than other races. *Id.* "It is not enough for the plaintiff merely to prove circumstances raising an inference of discriminatory impact at issue; [the plaintiff] must prove the discriminatory impact at issue." *Powell*, 189 F.3d at 394 (citing *Johnson v. Uncle Ben's*, 657 F.2d 750, 753 (5th Cir.1981)). In other words, Plaintiffs must prove that a facially neutral practice disparately and adversely impacts them, and that the disparate impact is causally linked to the contested practice. *Id.; see also Elston v. Talladega County Bd. of Ed.*, 997 F.2d 1394, 1415 (11th Cir. 1993); *New York City Environmental Justice Alliance v. Giuliani*, 214 F.3d 65, 69 (2d Cir.2000) (explaining that "[i]n order to establish a prima facie case of adverse disparate impact, [plaintiffs in a Title VI disparate action case] had to allege a causal connection between a facially neutral policy and a disproportionate and adverse impact on minorities." *Id.*)

■ 167. If the plaintiff meets this burden, then the burden shifts to the defendant to come forward with a "substantial legitimate justification," or a "legitimate, nondiscriminatory reason," for the contested practice. *Powell*, 189 F.3d at 393 (citations omitted).

■ 168. Finally, if the defendant is able to meet its rebuttal burden, the burden shifts back to the plaintiff to "establish either that the defendant overlooked an equally effective alternative with less discriminatory effects or that the proffered justification is no more than a pretext for racial discrimination." *Powell*, 189 F.3d at 394.

169. This Court has been able to identify only one reported federal court decision which: (1) addressed the application of the burden-shifting analysis to a Title VI, section 602 claim alleging disparate impact discrimination; (2) in the context of plaintiff's request for a preliminary injunction; (3) regarding an alleged violation of the EPA's Title VI implementing regulations, codified at 40 C.F.R. § 7.10 *et seq.* In *New York City Environmental Justice Alliance ("NYCEJA") v. Giuliani*, 214 F.3d 65 (2d Cir.2000), the Second Circuit considered a complaint brought by environmental organizations against New York City, alleging that the city's proposed destruction of city-owned lots containing community gardens would violate Title VI's prohibition on discrimination by recipients of federal funds. *NYCEJA*, 214 F.3d at 67. Specifically, the plaintiffs alleged that the destruction of the gardens would have a disproportionate, adverse impact on the mostly minority residents of the communities in which the gardens were located, in violation of 40 C.F.R. § 7.35. *Id.*

170. The Second Circuit held that the plaintiffs had failed to establish a prima facie case of disparate impact discrimination for two reasons. First, the Court found that plaintiffs failed to show a causal link between the elimination of the gardens and the alleged adverse effect on plaintiffs, namely, loss of outdoor recreational space. *NYCEJA*, 214 F.3d at 69–70. Second, the Court held that plaintiffs'

proposed indicator, or measure, of disparity, namely, "loss of open space," was not an "appropriate measure" of disparate impact. *Id.* According to the Court, an "appropriate measure" would be one that is adequate to allow the court to "ascribe significance to any alleged disparate impact" of the defendant's action. *Id.*

171. I note, however, that the facts upon which the Second Circuit's decision was based in *NYCEJA* are very different from the facts presented by Plaintiffs in the present action.

172. I conclude, therefore, that the application of the burden-shifting analysis to the claim raised by Plaintiffs in this case, which alleges disparate impact on the basis of a permitting decision, in violation of the EPA's Title VI implementing regulations, presents this Court with an issue of first impression. I note that the application of a Title VI analysis to environmental permitting decisions has been the subject of extensive debate among legal scholars. *See, e.g.,* Sheila Foster, *Piercing the Veil of Economic Arguments Against Title VI Enforcement,* 10 FORDHAM ENVT'L L.J. 331 (1999); Michael D. Mattheisen, *Applying the Disparate Impact Rule of Law to Environmental Permitting Under Title VI of the Civil Rights Act of 1964,* 24 WM. & MARY ENVT'L L. & POL'Y REV. 1 (2000); Julia B. Latham Worsham, *Disparate Impact Lawsuits Under Title VI, Section 602: Can a Legal Tool Build Environmental Justice?* 27 B.C. ENVT'L AFF. L.REV. 631 (2000); Bradford C. Mank, *Environmental Justice and Title VI: Making Recipient Agencies Justify Their Siting Decisions,* 73 TUL. L.REV. 787 (1999).

### S. Plaintiffs' Prima Facie Case

173. The basis for Plaintiffs' prima facie case, and the essence of their claim, is their allegation that the NJDEP's decision to permit the construction and operation of the SLC facility in Waterfront South, a neighborhood whose population is overwhelmingly African–American and Hispanic, is already home to a disproportionate number of the state's environmentally hazardous, pollutant-producing facilities, and whose residents already suffer poor health, disparately and adversely affects the residents of that community in violation of Title VI.

174. It is uncontested that the NJDEP's permitting policy is facially neutral. The NJDEP uses a complicated system, including air dispersion modeling, to predict the level and pattern of pollutant emissions from a proposed facility such as the SLC facility. The NJDEP then compares these results to the federally established NAAQS, set by the EPA, for the particular pollutants which will be produced by the facility. As counsel for the NJDEP explained at oral argument, once the NJDEP reaches the conclusion that a proposed facility will be in compliance with the NAAQS, the NJDEP's inquiry into the environmental impacts of the facility stops, and the NJDEP will issue a permit to operate the proposed facility. Trans. of Oral Arg. at 23.

175. In order to determine the likelihood that Plaintiffs will succeed on the merits of their claim that the NJDEP's permitting of the proposed SLC facility violated their rights under Title VI, I shall apply the disparate impact analysis articulated by the Third Circuit in *Powell v. Ridge,* 189 F.3d 387, 392 (1999). Specifically, I shall consider whether Plaintiffs have demonstrated that a facially neutral policy is causally related to an adverse disparate impact on Plaintiffs based on their race, color, or national origin. *Id.*

### (1) Adverse Impact

176. Plaintiffs contend that the operation of the proposed facility will adversely

impact them in several ways. After reviewing the record, I have determined that the primary adverse impacts of which Plaintiffs complain are impacts to the health of the residents who live in the Waterfront South neighborhood where the proposed SLC facility is located. While Plaintiffs also complain of adverse effects to their quality of life, caused by the noise, vibrations and dirt associated with the truck traffic which will traverse the neighborhood if the facility becomes operational, I have concluded that the record in this case is insufficient to support such a claim. Accordingly, I shall deny Plaintiffs' request for a preliminary injunction to the extent that it is based on the alleged adverse impact of the operation of the SLC facility on Plaintiffs' quality of life.

177. The operation of the proposed facility will impact the health of the residents of the Waterfront South community in two specific ways. First, particulate matter emitted from the proposed SLC facility will affect respiratory function in the members of the surrounding community, a disproportionate number of whom already suffer from asthma and other respiratory conditions which will be aggravated by the inhalation of particulate matter. Second, the ozone generated by the annual migration of 77,000 trucks making deliveries to and from the SLC facility will impact residents' health because it aggravates respiratory function and causes cancer. The Court has also found that the Waterfront South community in general, and African–American members of the community in particular, already suffer disproportionately high rates of cardiovascular disease and respiratory disease such as asthma.

178. The question that remains, however, is whether these impacts are sufficiently "adverse" to support a conclusion that Plaintiffs have carried this portion of their burden in making out a prima facie case of disparate impact discrimination under Title VI.

179. Plaintiffs argue that when the totality of the circumstances are considered, they have demonstrated that the permitting of the proposed SLC facility will affect them in a manner that is sufficiently adverse so as to be considered legally significant. Specifically, Plaintiffs contend that the addition of the SLC facility's pollutants to the existing environmental burden on the Waterfront South community will aggravate the pre-existing health problems of the surrounding community to a degree that meets the legal standard of "adverse."

180. Both the NJDEP and SLC respond to Plaintiffs' argument by contending that the SLC facility's emissions are *per se* not adverse. With respect to the PM–10 emissions, the NJDEP insists that because the PM–10 emissions will be in compliance with the governing NAAQS, set in 1987, they cannot be considered "adverse.". *See* NJDEP Br. at 10–13; SLC Br. at 42–43; Trans. of Oral Arg. at 20.

181. With respect to the ozone precursors which will be emitted by the 77,000–plus diesel trucks traveling through the neighborhood annually, the NJDEP argues that it was not required to consider the impact of these emissions when it permitted the SLC facility because truck emissions are regulated by individual tailpipe inspection, pursuant to the Clean Air Act. *See* 42 U.S.C. § 7521 *et seq;* Trans. of Oral Arg. at 16–20. The NJDEP admits that it did not review the effects of the truck emissions on the health of community residents or otherwise consider these emissions when deciding to permit the facility. Trans. of Oral Arg. at 17.

182. Defendants rely on four sources to support their claim that emissions which are in compliance with the NAAQS are *per*

*se* not "adverse": (1) the language of the Clean Air Act, codified at 42 U.S.C. § 7409; (2) the EPA OCR's decision in *Select Steel*; (3)the EPA Draft Guidances; and (4) the recent Supreme Court decision in *Whitman v. American Trucking Assoc., Inc.*, 531 U.S. 457, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001).

183. The Clean Air Act provides, in relevant part, as follows:

> (b) Protection of public health and welfare
>
> (1) National primary ambient air quality standards, prescribed under subsection (a) of this section shall be ambient air quality standards the attainment and maintenance of which in the judgment of the Administrator, based on such criteria and allowing an adequate margin of safety, are requisite to protect the public health. Such primary standards may be revised in the same manner as promulgated.

42 U.S.C. § 7409.

184. Based on this language, Defendants argue that by setting the NAAQS, the EPA has already, after extensive research and study, determined at what level an ambient airborne pollutant becomes "adverse" to public health. In the response issued by the NJDEP to the concerns raised at the public hearing on the SLC facility, Dr. Atay, the NJDEP Hearing Officer, explained the NJDEP's reliance on the NAAQS to determine "adversity":

> The primary NAAQS were established to protect public health with an adequate margin of safety. Principally based on human health studies, they are set to protect the most sensitive individuals. Those with respiratory or heart

conditions, children and the elderly would be among the groups considered sensitive individuals. Therefore, based on the dispersion modeling analysis of the proposed facility, no adverse health impacts are expected due to PM–10 emissions.

Montag Decl., Exh. C at 17.

185. To support the NJDEP's application of the NAAQS as the sole indicator necessary to evaluate whether a health impact is "adverse" for the purposes of a Title VI disparate impact analysis, Defendants cite the language of the EPA's OCR's *Select Steel Investigative Report* at length. Specifically, the NJDEP relies on the EPA Investigator's statement that:

> [T]he EPA believes that where, as here, air quality concerns are raised regarding a pollutant regulated pursuant to an ambient, health-based standard, and where the area is in compliance with, and will continue after the operation of the challenged facility to comply with, that standard, the air quality in the surrounding community is presumptively protective and emissions of that pollutant should not be viewed as "adverse" within the meaning of Title VI.

*Select Steel* at 28.

186. After a careful review of the *Select Steel Investigative Report*, however, the Court concludes that the NJDEP's reliance on *Select Steel* is based on a selective reading of that decision and is misplaced. First, the *Select Steel* decision states clearly that a recipient's obligations under Title VI include consideration, with respect to the permitting of pollutant-producing facilities, of factors *independent* of compliance with environmental statutes, such as the NAAQS.[9] *Select Steel* at 28.

---

9. "If recipients are found to have implemented their EPA-delegated or authorized federal environmental programs (e.g., permitting programs) in a manner which distributes other-

Second, immediately prior to the language cited by the NJDEP, the Select Steel Investigative Report states:

> Importantly, to be actionable under Title VI, an impact must be both 'adverse' and 'disparate.' The determination of whether the distinction of effects from regulated sources to racial or ethnic communities is 'adverse' within the meaning of Title VI will necessarily turn on the facts and circumstances of each case and the nature of environmental regulation designed to afford protection.

*Select Steel Investigative Report* at 28.

When considered in context, it is clear that the language cited by Defendants from *Select Steel* reflects the OCR's decision regarding the principal facts of that case. The decision in *Select Steel* does not stand for the blanket proposition that compliance with the NAAQS is always enough to assure that the impacts of a facility are not sufficiently "adverse" as to trigger Title VI, but only for the proposition that such a showing creates a presumption of non-adversity.

187. Furthermore, the methodology used by the EPA OCR to evaluate the "adversity" of the impact in *Select Steel* supports this Court's conclusion that evidence of compliance with the NAAQS is not the end point of an investigation into "adverse impact" under Title VI. The EPA OCR conducted a comprehensive analysis of not only the proposed facility's emissions in *Select Steel*, but also of the health conditions in the complainants' community, and the emissions of other NAAQS- and non-NAAQS regulated facilities in the area. *See Select Steel*, 13–25.

188. For example, the complainants in *Select Steel* were concerned about lead emissions. Genesee County, where the proposed facility was located, was in compliance with the NAAQS for lead. *Select Steel* at 30. Nevertheless, even before the EPA became involved, the NJDEP's counterpart in Michigan, the Michigan Department of Environmental Quality (MDEQ), conducted a study of existing blood lead levels in the community surrounding the actual facility in response to complainants' concerns. *Id.* The EPA OCR then reviewed not only the results of the MDEQ study, but further investigated county health data on existing blood lead levels in children, and the age of the community's housing, because older housing is linked to elevated blood levels. *Id.* at 31–32. Only after this extensive review of community-specific health data did the EPA conclude that the permitting and operation of the Select Steel plant would not "adversely" affect the residents.

189. In contrast, there is no evidence in the record before this Court to indicate that the NJDEP ever considered the existing health conditions in the Waterfront South community, although it was repeatedly asked to do so by Plaintiffs. *See, e.g.,* Pomar Cert., Exh. K at K23 (Hearing Officers Report); Pomar Cert., Exh. N. Indeed, as I have discussed above, there is ample evidence in the record which demonstrates that the residents of the Waterfront South community are already disproportionally affected by asthma and other respiratory diseases. This fact was brought to the NJDEP's attention not only by Plaintiffs, but also through the report

wise acceptable residual pollution or other effects in ways that result in a harmful concentration of those effects in racial or ethnic communities, then a finding of an adverse disparate impact on those communities within the meaning of Title VI may, depending on

the circumstances, be appropriate." A footnote to this statement explains that such a situation might involve, "[f]or example, scenarios involving the combined impacts of multiple pollutants, multiple pathways, and multiple plants." *Id.* at n. 12.

of CAP TAG member Dr. Berlin. *See* Smith Decl., Exh. R. The NJDEP, however, has insisted that it is neither obligated to consider the data which the Plaintiffs have produced, nor conduct its own inquiry before permitting the SLC facility.

190. The EPA OCR's analysis also considered community-specific environmental burdens beyond those measured by the NAAQS. The EPA OCR's air toxics analysis focused on "whether the permitted Select Steel emissions-either in and of themselves, or in combination with other emissions in the area-result in concentrations that may adversely impact the health of the residents in the surrounding area." *Select Steel* at 36. Significantly, EPA OCR found that the MDEQ's analysis of risk, which was based exclusively on the NAAQS, was insufficient because it did not consider the impact of multiple chemicals from multiple sources on the population. *Id.* at 33. To complete its analysis, the EPA OCR considered not just nearby sources of NAAQ-regulated emissions, but also examined the aggregate carcinogenic and non-carcinogenic effects of the emissions of all TRI-reporting sources in the area. *Select Steel* at 33. "The EPA approach used the modeled concentration estimates along with residential population information for Census blocks to estimate exposures, and health based benchmarks to project risks of potential impacts." *Id.* In other words, the EPA OCR reached its decision that the Select Steel facility's emissions would not adversely impact the community's health only after considering, in addition to NAAQS data, community-specific data on health conditions and cumulative environmental burdens.

191. While the EPA's method of analysis in *Select Steel* is instructive here, the circumstances of *Select Steel*, which led the EPA to conclude there was no adversity, are entirely distinguishable from the present case. First, the area of concern in *Select Steel* was in compliance for all relevant NAAQS; in contrast, it is undisputed that Camden County is in "severe nonattainment" of the established ozone NAAQS. Second, both MDEQ and the EPA OCR, in investigating the complainants' Title VI concerns, looked beyond mere compliance with the NAAQS and considered community-specific health data before determining that the facility would not adversely affect the residents' health. Third, the EPA examined the cumulative environmental burdens on the community, based on data from the TRI, before concluding that the aggregate effect of these pollutants would not adversely effect the residents' health. Only after this comprehensive review of community-specific data did the EPA OCR reach its conclusion that the MDEQ's decision to permit the facility did not violate Title VI.

192. The NJDEP also cites the EPA's Draft Guidances for Recipients of Funding and Investigation of Title VI Complaints to support its contention that SLC's compliance with the NAAQS both obviates the need for further investigation on the health-related impacts of the facility, and contravenes a finding that the permitting and operation of the facility will cause an adverse health impact on the residents of Waterfront South. As I noted previously, the Draft Guidances, published in June 2000, are not yet final and are not binding on this Court.

193. The NJDEP specifically cites language from the Draft Investigation Guidance, in which the EPA suggests that if a Title VI investigation includes an allegation of adverse impact based on a NAAQS-regulated pollutant, and the surrounding area is in attainment of the NAAQ standard for that pollutant, then the air quality will be considered presumptively protective of public health. *See* Draft Investiga-

tion Guidance, 65 Fed.Reg. 39650, 39680. The NJDEP ignores the fact that the EPA, in the Draft Investigation Guidance, prescribes the same method for adverse impact assessment that it applied in evaluating the *Select Steel* case. According to both the method described in the Guidance, and the practice used by the EPA in *Select Steel,* an investigation of "adverse" impact entails consideration of not just the NAAQS data, but in cases, such as the present one, in which the alleged adversity is the result of the cumulative effects of multiple pollutant sources, the investigation includes consideration of whether any scientific or technical information indicates that the cumulative impacts should be recognized as adverse under Title VI. *Id.* Specifically, the Draft Revised Investigation Guidance advises that the EPA OCR will begin investigation of Title VI complaints by determining the "universe of sources" affecting the complainant community, including not only those pollutants identified with the permitted activities, but also other sources of environmental stressors. 65 Fed.Reg. 39650, 39678. Significantly, the Guidance notes that even actions which are not explicitly covered by the permitting program, such as, for example, the diesel truck emissions in the present case, should be considered as part of the adverse disparate impact analysis, as long as the recipient of EPA funds, in this case, the NJDEP, has some obligation or authority concerning those sources. 65 Fed.Reg. 39650, 39678.

194. This understanding of the approach recommended by the Guidances is corroborated by the Preamble to the Guidances, in which the EPA states:

> EPA has remained mindful that no single analysis or definition of adverse disparate impact is possible due to the differing nature of impacts (e.g., cancer risk, acute health effects, odors) and the various environmental media (e.g., air, water) that may be involved. EPA did not set an across-the-board definition of adverse impact ... EPA will use environmental laws, regulations, policy and science as touchstones for determining thresholds for what is adverse.

65 Fed.Reg. 39650, 39654.

195. The NJDEP's characterization of the Draft Recipient Guidance is further undermined by the fact that the Draft Recipient Guidance, which is directed to recipients of funding such as the NJDEP, reminds recipients that identifying "potential and existing impacts may involve a broad spectrum of concerns." 65 Fed.Reg. 39650, 39658–59. The Guidance suggests a six-step methodology for evaluating allegations of disparate, adverse impacts, and provides a comprehensive list of sources and databases which recipients may consult in evaluating adversity and disparity of impact from a permit applicant's facility.[10]

---

**10.** Specifically, the Guidance identifies: (1) fifteen databases which contain demographic data and exposure data, including the Comprehensive Environmental Response Compensation and Liability Information System ("CERCLIS"), the Aerometric Information retrieval System ("AIRS"), and the AIRS Air Quality Subsystem ("AIRS/AQS" database, 65 Fed.Reg. at 39650–60; (2) four potential steps for recipients to use in conducting adverse disparate impact analysis, including defining the scope of the analysis, performing an impact assessment, making a decision as to whether the impact being assessed is significant enough to be considered "adverse," characterizing the affected population and making comparisons to non-affected populations to determine whether there is disparity, and then concluding with a decision as to whether the disparity is significant; (3) the tools and methodologies which are available for conducing disparate impact analysis, including a geographic information system ("GIS"); (4) ways to identify and integrate relevant data in an analysis, including a list which prioritizes data in terms of significance

196. Thus, the Court concludes, from a review of *Select Steel,* the Draft Recipient Guidance and the Draft Revised Investigation Guidance, that the NJDEP has misconstrued the meaning of EPA's interpretation of its Title VI regulations regarding reliance on the NAAQS as the sole and determinative measure of adversity of impact.

■ 197. The Court also concludes that the methodology the EPA described in the Guidances and used in *Select Steel,* which mandates consideration of the totality of circumstances and cumulative environmental burdens, is inconsistent with the NJDEP's contention that it need not consider SLC's truck traffic when assessing impact because mobile sources of pollution are regulated under a different program than stationary sources. Such an artificial and arbitrary distinction is clearly inapplicable to an assessment of adverse impact under Title VI. The NJDEP has cited no law to support its contention that it is not "authorized" to consider motor vehicle emissions when making a Title VI assessment regarding a permit application. NJDEP Br. at 13. The mere fact that stationary and mobile sources of emissions are regulated differently under the CAA does not, in the view of this Court, prohibit the NJDEP from considering the cumulative effects of the operation of the SLC facility on ambient air quality in the surrounding community pursuant to a Title VI investigation.

198. The Court further concludes that Plaintiffs have demonstrated that the permitting and operation of the SLC facility, when considered in the context of the current health conditions and existing environmental burdens in the Waterfront South community, is likely to adversely

affect their health to a degree that meets the standard of "adversity" under Title VI. The NJDEP has not disputed the fact that residents of this community already suffer a significantly disproportionate rate of cancer and asthma. Berlin Decl. at ¶¶ 31–32. Nor has it disputed, or even considered, the health consequences associated with the cumulative environmental burden this community already experiences as a result of the presence of a sewage treatment facility, power plant, trash-to-steam incinerator, two Superfund sites, fourteen sites the NJDEP has designated as contaminated, and approximately fifteen industrial facilities. Additionally, the area is in "severe noncompliance" with the ozone NAAQS. Pomar Cert., Exh. L. And, finally, the SLC facility will emit a level of PM–2.5 which exceeds the level that the EPA's research indicates is safe for the general population, to say nothing of its effects on a population which already suffers from significant respiratory ailments. 62 Fed.Reg. 38652. The United States Court of Appeals for the District of Columbia considered the analysis used by the EPA to make this determination, and found that the EPA's decision was based on the demonstration of a statistically significant relationship, proven through regression analysis, between PM–2.5 and negative health effects. *American Trucking Assoc., Inc. v. U.S.E.P.A,* 175 F.3d 1027, 1053–54 (D.C.Cir.1999), *rev'd in part and aff'd. in part, Whitman v. American Trucking Assoc.,* 531 U.S. 457, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). Based upon my review of the evidence in the record and my application of the analysis recommended and practiced by the EPA to determine adversity, I conclude that Plaintiffs are likely to succeed on the merits of

---

for disparate impact analysis; (5) resources for assessing the significance of an impact; and (6) and methods for conducting disparity

analyses and assessing the significance of disparity if it is found. 65 Fed.Reg. 39650, 39659–39662.

their Title VI claim to the extent that their success depends on their ability make a prima facie showing of adverse impact.

## (2) Disparate Impact

■ 199. Following the test articulated by the Third Circuit in *Powell*, disparity is the second part of the three-part test Plaintiffs must satisfy to establish a prima facie case of disparate impact discrimination in violation of Title VI. Disparity in Title VI cases may be proved through the use of "appropriate statistical measures." *See New York Urban League, Inc. v. State of New York*, 71 F.3d 1031, 1038 (2d Cir. 1995). In *NYCEJA v. Giuliani*, 214 F.3d at 70–71, discussed above, the Second Circuit based its decision to reject the plaintiffs' motion for a preliminary injunction, in a case brought pursuant to the EPA's Title VI implementing regulations, on a finding that the plaintiffs had failed to demonstrate the "appropriateness" of their measure of disparity. The plaintiffs in *NYCEJA* claimed that New York City's decision to sell about 1100 city-owned parcels of land on which were built approximately 600 community gardens, violated Title VI because the elimination of the gardens would have an adverse disparate impact on individuals based on their race, color, or national origin. *NYCEJA*, 214 F.3d at 66. The Second Circuit rejected this claim in part because the plaintiffs' measure of disparity was "loss of open space," a measure which the court determined the plaintiffs had not adequately supported through the use of statistical evidence. The Second Circuit explained that "in using 'open space' as a measure, the plaintiffs needed to establish that its reduction in minority communities determines the impact of the City's actions on those communities compared with the impact of those actions on non-minority communities." *Id.* at 71–72 (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977,

994–95, 108 S.Ct. 2777, 101 L.Ed.2d 827(1988)). In *Watson*, the Supreme Court explained that to establish a prima facie case of disparate impact discrimination in a Title VII case, "plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the [harm of which the plaintiff complains]. Our formulations, which have never been framed in terms of any rigid mathematical formula, have consistently stressed that statistical disparities must be sufficiently substantial that they raise such an inference of causation." 487 U.S. at 994–95, 108 S.Ct. 2777.

200. To support their claim that pollutant-producing facilities in New Jersey are disproportionately located in communities of color, Plaintiffs rely primarily on the expert report of Dr. Michel Gelobter.

201. Dr. Gelobter analyzed the correlation between race and the distribution of facilities that emit air pollution in New Jersey. Dr. Gelobter performed two different analyses. First, he gathered data on the number of air pollution emitting facilities from the "Aieromteric Information Retrieval System, Air Facilities Subsystem" ("AIRS/AFS") database, which is one of thirteen publically available databases which comprise the EPA's "Envirofacts" database. Dr. Gelobter then gathered data on the racial composition of New Jersey ZIP Code areas using the 1990 U.S. Census results. Comparing these data, Dr. Gelobter found that ZIP Code 08104, which includes the Waterfront South Area, has 21 AIRS/AFS facilities, compared to a statewide average of 7.8 AIRS/AFS facilities per ZIP code. Gelobter Cert. at ¶ 16; Gelobter Amended Cert. at ¶ 16. Dr. Gelobter further found that ZIP codes with higher than the state-wide average of 20.6% non-white residents had an average of 13.7 AIRS/AFS facilities per ZIP code, or 105% more AIRS/AFS facilities, than

those with a below-average number of non-white residents, which had an average of 6.7 AIRS/AFS facilities per ZIP Code. Amended Gelobter Cert. at ¶ 16. ZIP Code 08104, which corresponds with Waterfront South, has 230% of the statewide average of AIRs/AFS facilities. *Id.* at ¶ 16.

202. Second, Dr. Gelobter collected data on the average number of EPA-regulated facilities per ZIP Code in New Jersey, which is 37.8 facilities per ZIP Code. Amended Gelobter Cert. at ¶ 18. Dr. Gelobter then compared the actual number of such facilities in each ZIP Code with the percentage of that ZIP Code's residents who were above or below the state average of non-white residents. Dr. Gelobter concluded that ZIP Code 08104, which includes the Waterfront South area, contains 70 EPA-regulated facilities, which is 185% of the state-wide average of 36.5 EPA-regulated facilities per ZIP Code. *Id.* at ¶ 18.

203. Finally, Dr. Gelobter performed a regression analysis of the relationship between EPA-regulated facilities and the percentage of non-whites in a ZIP Code area. Dr. Gelobter found that for every 10% increase in the percentage of non-white residents in a given ZIP Code, the ZIP Code would experience a 16% increase over the average number of EPA-regulated facilities. Gelobter Cert. at ¶ 22. Amended Gelobter Cert. at ¶ 22. According to Dr. Gelobter's Certification, based on his statistical analysis, "the odds that there is no relationship between the percentage of non-white residents and the number of facilities in a ZIP Code area are less than 3 in 10 million." *Id.*

204. Defendant's expert, Dr. Don Coursey, disputes Dr. Gelobter's findings based on Dr. Coursey's contention that Dr. Gelobeter's analysis is cursory and inadequate. Specifically, Dr. Coursey faults Dr. Gelobter for: (1) failing to undertake and integrate the results of a comprehensive demographic study of Camden's past, from the early 1900s to the present; (2) failing to consider additional factors which have been associated with siting decisions, including population density, presence of interstate highways, and access to water transportation; (3) making numerous mathematical errors; and (4) employing a purely statistical, one-dimensional analysis which fails to establish a causal link between race and the siting of environmentally hazardous facilities in New Jersey. Coursey Decl. at ¶¶ 7–14, 17. Dr. Coursey states that a "correct analysis would require an in-depth, time-consuming examination of a multitude of factors. Conservatively, this process would require approximately 12 months of study and analysis." Coursey Decl. at ¶ 4.

205. While Dr. Gelobter and Dr. Coursey are at odds on every point in dispute, I find that Dr. Gelobter's basic conclusion that in the State of New Jersey there is "a strong, highly statistically significant, and disturbing pattern of association between the racial and ethnic composition of communities, the number of EPA regulated facilities, and the number of facilities with Air Permits," to be sound. Amended Gelobter Cert. at ¶ 24. At this stage of the proceedings, I find the evidence in the record amply supports a finding of disparate impact. Moreover, Dr. Gelobter's conclusion is further supported by the undisputed fact that 91% percent of the population of Waterfront South consists of members of racial or ethnic minorities. Pomar Cert. at Exh. A.

206. I note that both the databases utilized by Dr. Gelobter, and the methods of statistical analyses he employed, have been identified in the EPA Guidances as appropriate for assessing disparity of im-

pact in permitting decisions pursuant to Title VI. *See* Draft Recipient Guidance, 65 Fed.Reg. 39650, 39661. The Draft Investigation Guidance states that the EPA OCR, in assessing disparate impact, will first characterize the populations to be compared, and then conduct comparisons. 65 Fed.Reg. 39650, 39681–39682.[11] Furthermore, the measures Dr. Gelobter selected to use in conducting his analysis, such as the number of EPA-regulated facilities per ZIP code, are culled from databases maintained and specifically recognized by the EPA as appropriate sources of data for conducting disparate impact analysis, such as the EnviroFacts, CERLCIS, AIRS, and AIRS/AQS databases. 65 Fed.Reg. 39650, 39659–60.

207. The NJDEP did not oppose Plaintiffs' claim of disparity, nor did the NJDEP respond to the data submitted by Dr. Gelobter. The NJDEP simply terminated its analysis of Plaintiffs' disparate impact claim at the point that the NJDEP determined that the SLC facility would not have an "adverse" impact because it would not cause an exceedence of the PM–10 NAAQS. Defs. Br. at 12–14 (stating that "NJDEP's application of the NAAQS for PM–10 has not subjected the Plaintiffs to any adverse impact and, therefore, has not subjected the Plaintiffs to any discriminatory effect under USEPA's Title VI regulations." *Id.*)

208. SLC does not contest Plaintiffs' contention that industrial facilities are unequally distributed in New Jersey, and appears willing to concede that a dispro-portionate number of industrial facilities may be located in Camden. *See* SLC Br. at 45. SLC, however, contends that Plaintiffs have failed to meet their burden of proof with respect to the third and final element of the *Powell* test for disparate impact under Title VI: causation. I shall address SLC's argument in the section on causation set forth below.

■■■ 209. Based on my review of Dr. Gelobter's testimony, and my consideration of the testimony of Dr. Coursey, I conclude that Plaintiffs have established a prima facie case of disparate impact. Specifically, I conclude that Dr. Gelobter used an appropriate measure to calculate disparity, in that he relied on databases and methodology recommended by the EPA for the purpose of measuring disparate impact. Therefore, I conclude that Dr. Gelobter's research and indicia of disparity satisfy the requirement, set forth by the Second Circuit in *NYCEJA*, that plaintiffs alleging disparate impact in violation of Title VI demonstrate that they used an "appropriate measure" of disparity. *NYCEJA*, 214 F.3d at 70–71. Furthermore, I conclude that Dr. Gelobter's analysis reveals a statistically significant association between the permitting and placement of environmentally regulated facilities in New Jersey and the percentage of minority residents in those communities. *See* Amended Gelobter Cert. at ¶ 4.

### (3) Causation

■■■ 210. Applying the Third Circuit's disparate impact analysis for Title VI

---

**11.** The Draft Guidance for Recipients recommends:(1) associating the impact assessment results with data from the most recent available census, and (2) comparing the affected population to a comparison population, which "should generally be larger that the affected population, and may include the general population for the reference area, (e.g., a county or state population which includes the affected population) or the non-affected popu-lation for the reference area (e.g., those in the reference area which are not part of the affected population." The EPA concludes that the "determination of what level(s) of disparity that can be considered significant should take into account the nature of the decision being made [ ]; the type of disparity comparison; the consistency of the results between multiple comparisons; and underlying data quality." 65 Fed.Reg. 39650, 39662.

cases, the final element of a plaintiff's *prima facie* case is the demonstration that the alleged adverse disparate impact is causally linked to defendant's facially neutral policy. *Powell*, 189 F.3d at 394. In *NYCEJA*, the Second Circuit articulated the importance of this element in the specific context of an allegation of discrimination in violation of the EPA implementing regulations to Title VI: "[t]he plaintiffs understood, of course, that they were required to do more than demonstrate to the district court that [the alleged discriminatory action] was a bad idea. In order to establish a prima facie case of adverse disparate impact, [plaintiffs] had to allege a causal connection between a facially neutral policy and a disproportionate and adverse impact on minorities." *NYCEJA*, 214 F.3d at 69.

211. In this case, Plaintiffs rely primarily on the Certification of Dr. Gelobter to demonstrate a causal link between the disparity of distribution of industrial, pollutant-producing facilities in New Jersey and the NJDEP's facially neutral permitting policy, which is based exclusively on compliance with the NAAQS. Specifically, Dr. Gelobter undertook a regression analysis of the relationship between EPA-regulated facilities and the percentage of non-whites in a ZIP Code area. Amended Gelobter Cert. at ¶ 22. The results of the regression analysis indicate that the odds that there is no relationship between the percentage of non-white residents and number of facilities in a ZIP Code area are approximately three in 10 million. *Id.*

212. The NJDEP did not brief the issue of causation for the same reason it did not brief the issue of disparity: once the NJDEP decided that the impact of proposed SLC facility would not be "adverse," because the facility's emissions will not cause an exceedence of the PM–10 NAAQS, the NJDEP terminated its analysis of Plaintiffs' disparate impact claim. *See* NJDEP Br. at 15. (stating that "[p]laintiff's mere analysis of facility locations within various zip codes, which is argued by Plaintiffs to be proof of 'disparity,' is not a basis by which to find that an adverse impact or, therefore, a violation of USEPA's Title VI regulations, has occurred.")

213. SLC, however, briefed the causation issue at length. SLC Br. at 44–46. SLC contends that based on Dr. Gelobter's analysis, Plaintiffs make an "unsubstantiated leap" to the conclusion that the NJDEP's permitting process is causally linked to the admitted disparity in the distribution of industrial facilities in the State of New Jersey. *Id.* at 44. According to SLC, this Court must reject Dr. Gelobter's data on causation because he failed to consider all of the factors that could account for the siting of industrial facilities in particular areas, such as access to transportation, existing infrastructure, and available labor force. *Id.* at 44. Thus, SLC asserts that "even assuming the statistical evidence that Plaintiffs have produced is accurate, those statistics are not the result of some defect in NJDEP's permitting process, but are rather the result of hundreds, if not thousands, of individual siting decisions made by private entities searching on the basis of sound business principles for the most appropriate locations for their industrial facilities." SLC Br. at 46.

214. I reject SLC's argument for several reasons. First, this Court has already concluded that there is in fact a severe "defect" in the NJDEP's permitting process, namely, that the NJDEP relies exclusively on compliance with environmental regulations such as the NAAQS, without considering its obligations under Title VI, in issuing permits such as those it issued for the proposed SLC facility.

215. Second, a review of the applicable regulations promulgated by the EPA clearly indicates that the EPA has determined that there is a causal connection between recipients' permitting practices and the distribution of polluting facilities, and enacted the implementing regulations to Title VI to ensure that recipients consider the potential disparate impact of their permitting decisions. *See* 40 C.F.R. § 7.10 *et. seq.* In other words, the EPA has acknowledged that because recipients are responsible for permitting, they are also responsible for considering the distribution of the facilities which they permit with respect to the classes protected by the Civil Rights Act of 1964. The regulations therefore support the conclusion that a recipient's permitting decisions are causally linked to the distribution of facilities as a matter of law.

216. Third, SLC ignores the fact that without receiving a permit from the NJDEP, none of the hundreds or thousands of business to which it refers may legally operate in the State of New Jersey. As I just explained, the EPA implicitly rejected SLC's contention that there is no causal connection between the distribution of facilities and the permitting process when it issued the implementing regulations to Title VI. I conclude that SLC's contention that the NJDEP's permitting practices are absolutely irrelevant to the siting of industrial facilities in New Jersey is illogical, and contradicted by the applicable Title VI regulations.

217. Fourth and finally, after reviewing the expert testimony submitted by both Plaintiffs and SLC on the issue of causation, and the facts of this case, I have concluded that the Plaintiffs have carried their prima facie burden of demonstrating that the NJDEP's permitting practices are causally linked to the adverse, disparate impact about which Plaintiffs complain.

SLC again cites to *NYCEJA* to support its argument that Plaintiffs have not carried their burden with respect to causation. I conclude, however, that *NYCEJA* is distinguishable both on the law and the facts from this case. First, *NYCEJA* did not involve permitting and, as I have already noted, the EPA recognizes the existence of a causal connection between permitting practices and distribution of facilities as a matter of law. Second, the data upon which plaintiffs relied in the *NYCEJA* case to establish causation was rendered moot by the City's decision, after the suit was filed, to withdraw many of the contested garden plots from the auction blocks and sell them to two not-for-profit organizations which agreed to preserve them as "open space." *NYCEJA*, 214 F.3d at 69. Third, the Second Circuit found that plaintiffs in *NYCEJA* failed to show causation in part because they failed to establish, through the use of "appropriate measure[s] such as facts and statistics, the impact of the [disputed practice] on similarly situated members of protected and non-protected groups." *Id.* at 70. In contrast, as I have concluded, Plaintiffs in this case have submitted statistical evidence, utilizing measures recommended by the EPA, which causally links the NJDEP's permitting practice to the disparate distribution of facilities in New Jersey.

218. In sum, because I have concluded that Plaintiffs have adequately demonstrated that the NJDEP's permitting practices result in an adverse, disparate impact on the basis of race, color, or national origin, I conclude that Plaintiffs have made a prima facie case of disparate impact discrimination under Title VI.

### T. Defendants' Rebuttal Burden

219. Under *Powell,* after the plaintiff establishes a *prima facie* case of disparate impact discrimination, the defen-

dant has the opportunity to rebut the resulting inference of discrimination by showing that it had a "substantial legitimate justification" or a "legitimate nondiscriminatory reason" for its practice. *Powell*, 189 F.3d at 393–94.

220. The NJDEP did not specifically address the issue of justification, again, because it terminated its disparate impact analysis, with the conclusion that the proposed SLC facility would not violate the PM–10 NAAQS and therefore would not "adversely" affect Plaintiffs. To the extent that the NJDEP might argue that the proposed facility's compliance with the NAAQS constitutes a substantial, legitimate justification for its permitting decision, I have already explained that I reject that reasoning because it is based exclusively on an analysis of environmental regulations and does not include considerations required by Title VI.

221. SLC, however, has offered several justifications for the NJDEP's decision. These include: (1) the fact that the proposed SLC facility was in compliance with the NAAQS and all applicable environmental regulations; (2) the fact that SLC and the NJDEP "consulted with the community;" and (3) the fact that the City of Camden "needs the economic and social benefits that come with a renewed industrial presence attuned to its environmental responsibilities." SLC Br. at 47. SLC did not cite any case law or other statutory or administrative source to support its contention that these justifications meet the standard set forth in *Powell.*

222. As I have already noted, the application of the Title VI, burden-shifting analysis to allegations of disparate impact discrimination in violation of the EPA's Title VI implementing regulations, in the context of a permitting decision, present issues of first impression. There is no reported decision to guide this Court's deter-

mination of whether the justifications raised by SLC on the NJDEP's behalf are adequate for me to conclude that the NJDEP and SLC have carried their rebuttal burden. I note that the governing Third Circuit decision setting forth the standard for disparate impact analysis in the context of Title VI, *Powell*, was decided on a motion to dismiss and therefore did not address the defendant's burden. Furthermore, in *NYCEJA*, the only reported decision applying the EPA's Title VI regulations, the Court concluded that plaintiffs in that case had failed to make a prima facie case of adverse disparate impact discrimination. *NYCEJA*, 214 F.3d at 71–72. Therefore, the Second Circuit never reached the defendant's alleged justification for its action. *Id.*

223. In the absence of guiding legal precedent on the question of what constitutes a "substantial legitimate justification" or a "legitimate nondiscriminatory reason" in the context of this case, I shall look to EPA regulations and practice.

224. According to the Draft Revised Investigation Guidance, once the EPA OCR makes a finding that a proposed facility will have an adverse, disparate impact on the complainants, "[t]he recipient will have the opportunity to 'justify' the decision to issue the permit notwithstanding the adverse disparate impact, based on a substantial, legitimate justification." 65 Fed.Reg. 39650, 39683. The Guidance cautions that "determining what constitutes an acceptable justification will necessarily be based on the facts of the case," but states that "generally, the recipient would attempt to show that the challenged activity is reasonably necessary to meet a goal that is legitimate, important, and integral to the recipient's institutional mission." *Id.* The Guidance identifies the following types of justifications as examples which the EPA might consider substantial

and legitimate: (1) a demonstration that the permitting action will provide a public health or environmental benefit to the affected population; (2) a demonstration that the permitting action will have economic benefit, if the benefit is "delivered directly to the affected population." *Id.* In assessing the validity of an economic justification, OCR will consider both the recipient's perspective, and the affected community's perspective, on whether the permitted facility will in fact provide direct economic benefits to the community. 65 Fed.Reg. 39650, 39683.

225. I conclude that the record in the present case is insufficient for me to determine whether the NJDEP can provide a "substantial, legitimate justification," in the context of Title VI analysis, for its permitting decision. SLC did not cite any applicable legal, statutory, or regulatory source to support its conclusion that the NJDEP provided sufficient justification for its decision to permit the SLC facility. Neither the NJDEP nor SLC has addressed the NJDEP's potential justifications with reference to the guidelines suggested by the EPA, which, as I have stated, are the only source this Court can find that specifically addresses a Title VI rebuttal analysis in permitting decisions.

226. Accordingly, because Defendants have failed to carry their rebuttal burden, Plaintiffs have established a likelihood of success on the merits.

## U. IRREPARABLE HARM

227. Having concluded that Plaintiffs are likely to succeed on the merits of their claim for injunctive relief, I must now consider whether Plaintiffs have met the second prong of the four-part test for a preliminary injunction, namely, whether they have demonstrated that they will suffer irreparable harm in the absence of the issuance of an injunction. *See Doe*

*v. Nat'l Bd. of Medical Examiners,* 199 F.3d 146, 154 (3d Cir.1999) (quoting *American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ.,* 84 F.3d 1471, 1477 n. 2 (3d Cir. 1996)) (en banc).

228. The Third Circuit has held that what constitutes irreparable harm in a particular case depends on the facts and circumstances of that case. *Oburn v. Shapp,* 521 F.2d 142, 151 (3d Cir.1975). Furthermore, the Third Circuit has recognized that the analysis of the plaintiffs' likelihood of success on the merits and the issue of irreparable harm may be closely linked. *Kennecott Corp. v. Smith,* 637 F.2d 181, 188 (3d Cir.1980).

229. In this case, I have considered Plaintiffs' allegation that they will be adversely affected by the permitting and operation of the proposed facility, and weighed Plaintiffs' evidence against Defendants' argument that emissions which are within the NAAQS are *per se* not adverse. Based on the uncontested evidence contained in the record on the prevalence of respiratory disease in the area, the extent of the universe of pollutants to which Plaintiffs are already exposed, the fact that the area is already in "severe nonattainment for the ozone NAAQS," and EPA's own determination that the currently enforceable NAAQS for particulate matter are inadequate to protect the public health, I concluded that Plaintiffs have demonstrated that the permitting and operation of the facility is likely to have a significantly adverse impact upon them. Accordingly, I shall rely on the findings of fact and conclusions of law, made pursuant to my consideration of the Plaintiffs' likelihood of success on the merits of their claim, in evaluating their allegation of irreparable harm.

230. In contesting the Plaintiffs' claim that they will be irreparably harmed in the

absence of injunctive relief, both the NJDEP and SLC return to their now-familiar refrain that compliance with the NAAQS is tantamount to preventing adverse impact or irreparable harm, and that ozone emissions from the diesel truck traffic are irrelevant to a finding of irreparable harm. SLC Br. at 51–57; NJDEP Br. at 22. Specifically, Defendants reiterate their arguments that there is no NAAQS for PM–2.5 emissions, and such emissions should not be considered by this Court in evaluating the issue of irreparable harm. Moreover, they contend that because truck emissions are regulated under a separate regulatory scheme than that which applies to stationary sources, this Court may not consider the impact of the truck emissions on Plaintiffs. SLC Br. at 52–53; NJDEP Br. at 23–25. Furthermore, Defendants argue that this Court should defer to the NJDEP's finding, based exclusively on the NAAQS, that the facility will not harm the health of Plaintiffs. SLC Br. at 52 (citing *Fertilizer Inst. v. Browner*, 163 F.3d 774, 777 (3d Cir.1998)).

231. In rejecting Defendants' argument, I specifically note that, as I have explained before, the EPA itself has decided that the PM–10 NAAQ standard, upon which SLC and NJDEP rely, is inadequate to protect the public health. Therefore, in 1997, the EPA promulgated more restrictive PM–10 regulations and, significantly, a new, separate PM–2.5 standard. *See* 62 Fed.Reg. 38560, 39652. The EPA stated that the new PM standards were necessary to protect against a wide range of PM-related health effects, "including premature mortality and increased hospital admissions and emergency room visits, primarily in the elderly and individuals with cardiopulmonary disease; increased respiratory systems and disease, in children and in individuals with cardiopulmonary disease such as asthma; decreased lung function, particularly in children and individuals with asthma,; and alterations in lung tissue and structure and in respiratory tract defense mechanisms." 62 Fed. Reg. 38652. In reaching this conclusion, the EPA conducted a scientifically rigorous, comprehensive review of the "greatly expanded body of community epidemiological studies" on the health effects of particulate matter inhalation. 62 Fed.Reg. 38652, 38655.

232. I further note that, even without the operation of the SLC facility, Camden is already at the EPA-recommended level for PM–2.5. Pomar Suppl. Cert. at ¶ 3. It is uncontested that residents in the area in which the proposed SLC facility is located suffer from significantly high rates of asthma and other cardiopulmonary disease, and that 40% of the residents of Waterfront South are children.

233. The Court is fully aware of the fact that the new PM NAAQS, which were issued by the EPA in 1997, are not currently in effect.[12] *See American Trucking*

12. As I have explained before, shortly after the EPA issued the new PM NAAQS, along with new, more restrictive ozone NAAQS, several industry groups filed petitions for review of the standards with the Court of Appeals for the District of Columbia. *See American Trucking Assoc. v. U.S.E.P.A.*, 175 F.3d 1027 (D.C.Cir.1999), *aff'd in part and rev'd in part, Whitman v. American Trucking Assoc.*, 531 U.S. 457, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001)). With respect to the new PM–2.5 NAAQS, the Court held that "[g]iven EPA's statutory mandate to establish standards based on the 'latest scientific knowledge,' 42 U.S.C. §§ 7408(a)(2), 7409(d), the growing empirical evidence demonstrating a relationship between fine particle pollution and adverse health effects amply justifies establishment of new fine particle [PM–2.5] standards." *American Trucking Assoc.*, 175 F.3d at 1056. The Court, however, rejected the EPA's proposed method of measuring "coarse particulate matter," which is PM larger than 2.5 microns in diameter but smaller than ten microns in diameter

*Assoc. v. U.S.E.P.A.,* 175 F.3d 1027 (D.C.Cir.1999), *aff'd in part and rev'd in part, Whitman v. American Trucking Assoc.,* 531 U.S. 457, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). The Court is not suggesting that the NJDEP could or should have used the proposed PM–2.5 NAAQS when determining whether the proposed SLC facility would be in compliance with environmental regulations. Rather, the Court concludes that the evidence in the record, even without consideration of EPA's findings regarding PM–2.5, supports the Court's conclusion that Plaintiffs would be irreparably harmed by the operation of the SLC facility prior to the NJDEP's compliance with Title VI regulations.

234. Separate and apart from the level of PM–2.5 emitted by the SLC facility, there is ample evidence to support the conclusion that Plaintiffs will be irreparably harmed in the absence of injunctive relief, based on the totality of the circumstances, including but not limited to the additional ozone generated by the diesel truck traffic associated with the proposed facility and the additional environmental burdens which the SLC facility will impose on an already environmentally burdened community.

235. Furthermore, I note that injury to the environment, such as that alleged by Plaintiffs in this case, has been found by courts to be especially difficult to remedy and usually irreparable. *See, e.g., Natural Resources Defense Council v. Texaco Re-*

*fining and Marketing, Inc.,* 906 F.2d 934, 941 (3d Cir.1990) (citing *Amoco Production Co. v. Village of Gambell, AK,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987))(explaining that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.") The Supreme Court's decision in *Amoco* was applied by my colleague, Judge Lechner, in *U.S. v. Tzavah Urban Renewal Corp.,* 696 F.Supp. 1013 (D.N.J.1988). *Tzavah* involved a suit brought by the Government on behalf of the EPA, seeking a preliminary injunction against owners of an old hotel who, in renovating the hotel, had failed to comply with CAA regulations regarding the disposal of asbestos. In concluding that a preliminary injunction was warranted, Judge Lechner held that the presence of the asbestos and continued emission of asbestos dust into the community posed a significant health risk to residents of the community. Citing *Amoco,* Judge Lechner concluded that "[a]s injury to the environment is especially difficult to remedy, injunctive relief is appropriate when a defendant's conduct poses a continued threat to environmental well-being." *Tzavah,* 696 F.Supp. at 1022. The Court recognizes that the defendants in *Tzavah* were found to be in violation of the asbes-

---

(PM+2.5–10). After convincing the Court of the necessity of monitoring "coarse particulate matter" separately from "fine particulate matter" due to the distinct and serious health risks posed by each, the EPA then proposed to measure PM+2.5–10 by using the PM–10 measurements already in place. Because the EPA did not propose a separate means for monitoring "coarse particulate matter," or PM+2.5–10, but rather proposed to monitor them indirectly through the PM–

10 NAAQS, the EPA concluded that the PM–10 regulations were "arbitrary and capricious," and remanded the entire PM NAAQS to the EPA. *Id.* The EPA appealed portions of the Court of Appeals' ruling to the Supreme Court; however, none of the questions upon which the Supreme Court granted certiorari concerned the PM standards. *Whitman v. American Trucking Assoc.,* 531 U.S. 457, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001).

tos National Emissions Standard for Hazardous Air Pollutants, which imposes strict liability for such violations because asbestos is an "ultrahazardous material," whereas the emissions from SLC's proposed facility in this case are within the currently enforceable NAAQS. *Tzavah,* 696 F.Supp. at 1021–22. Nonetheless, I agree with Judge Lechner's conclusion that injunctive relief is appropriate when a defendant's conduct poses a continued threat to the environment.

236. Finally, because this Court has concluded that the NJDEP failed to consider important factors which it is mandated by law to consider, namely, the health status and cumulative environmental burdens in a receptor community, prior to making a determination that the proposed SLC facility would not adversely affect Plaintiffs and permitting the facility, I need not defer to NJDEP's decision to permit the facility.[13]

237. Thus, I conclude that Plaintiffs have demonstrated that the operation of SLC's proposed facility, in the absence of an evaluation by NJDEP assessing adverse disparate impact based on the totality of the circumstances, including the existing health status and cumulative environmental burdens of the receptor community, poses a serious and irreparable threat to the environment and well-being of the Plaintiffs in this case. Therefore, I hold that Plaintiffs have carried their burden of demonstrating irreparable harm.

## V. IRREPARABLE HARM TO OTHER PARTIES, AND THE PUBLIC INTEREST

238. The final two considerations which the Court must evaluate in deciding whether to grant preliminary injunctive relief are whether the grant of such relief will cause irreparable harm to the non-moving party, and whether the grant of an injunction is in the public interest. *See Doe v. Nat'l Bd. of Medical Examiners,* 199 F.3d at 154.

239. Plaintiffs contend that the NJDEP will not be harmed by the issuance of an injunction, because the injunction which Plaintiffs request only requires the NJDEP to meet its existing obligations under Title VI. Pls.' Br. at 34. Plaintiffs concede that SLC will suffer economic injury if an injunction issues, but argue that SLC assumed this risk by beginning construction of the proposed facility over a year before the NJDEP issued the per-

---

**13.** Accordingly, *Fertilizer Inst. v. Browner,* 163 F.3d 774, 777 (3d Cir.1998), cited by SLC, is inapposite. In that case, the Court noted:

> Courts review agency decision making with deference. The Administrative Procedure Act provides that a court should 'set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. §§ 706(2)(A). Grounds for concluding that the agency acted arbitrarily and capriciously include its reliance on factors outside those Congress intended for consideration, a complete failure by the agency to consider an important aspect of the problem, or an agency's explanation contrary to, or implausible in light of, the evidence. *See Motor Vehicle Mfrs.*

*Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also Pennsylvania Dep't of Pub. Welfare v. United States Dep't of Health and Human Servs.,* 101 F.3d 939, 943 (3d Cir.1996) (reversal appropriate if action 'irrational, not based on relevant factors, or outside statutory authority'). We have often stated that in assessing the record, the court should not substitute its own judgment for the scientific expertise possessed by the agency. *See, e.g. Southwestern Pa. Growth Alliance v. Browner,* 121 F.3d 106, 117 (3d Cir.1997). *Fertilizer Inst.,* 163 F.3d at 777.

Thus, because I have concluded that NJDEP did not comply with Title VI, NJDEP is entitled to no special deference in this case.

mits, which were not issued until October 31, 2000. Furthermore, Plaintiffs argue that SLC was aware, due to Plaintiffs' frequent protests, that Plaintiffs believed the NJDEP had not complied with the requirements of Title VI and that disagreements over the permitting process raised the possibility of civil rights litigation. Finally, Plaintiffs note that the NJDEP advised SLC, by letter dated September 2, 1999, well before SLC began construction, that "[d]ue to the fact that St. Lawrence will be operating in an economically depressed area which has a substantial minority population, the Department will evaluate the need to conduct an Environmental Justice analysis." Pomar Cert., Exh. B at B–2.[14]

240. Plaintiffs further assert that the public interest favors the grant of preliminary injunctive relief. Plaintiffs argue that the general interests of the public will be best served by the issuance of an order requiring the NJDEP to comply with its Title VI obligations. Additionally, Plaintiffs claim that the specific public interests of the 2,000 residents of Waterfront South and the 15,000 residents of the surrounding area of the City of Camden, both in the protection of their federal civil rights and in the protection of their health, will best be served by the issuance of an injunction. *See* Pls.' Br. at 35.

241. The NJDEP does not contend that it will be harmed should the Court grant injunctive relief. The NJDEP does, however, argue that the public interest would best be served if this Court would refuse to "substitute the policy advocated by the Plaintiffs for the policy embodied in the regulations promulgated by the Federal and State agencies authorized to do so under the CAA." NJDEP Br. at 26. I have

already concluded, however, that the criteria and methods which the NJDEP used to evaluate SLC's permit applications violate the EPA's Title VI implementing regulations. I am not requiring the NJDEP to substitute its policy for that recommended by the Plaintiffs, but instead requiring it to comply with the policies mandated by the EPA and Title VI. Because I have concluded that the NJDEP failed to comply with EPA's Title VI regulations, the NJDEP's argument that it is in the public interest for this Court to defer to its erroneous permitting procedure is without merit.

242. SLC argues that the granting of preliminary injunctive relief as requested by Plaintiffs will cause immeasurable harm to SLC and will "thwart" the public interest. The harm alleged by SLC is entirely economic. SLC Br. at 57. Specifically, SLC argues that it has expended more than $50 million to construct the facility, and will lose $200,000 for each week that the facility does not operate. *Id.* The Third Circuit has held, however, that purely economic injury is not irreparable harm. *See Frank's GMC Truck Center, Inc. v. GMC,* 847 F.2d 100, 102 (3d Cir.1988). Furthermore, as Plaintiffs point out, SLC explicitly assumed the risk in constructing the proposed facility prior to NJDEP's issuance of the permits. *See* Pomar Cert., Exh. C; N.J. Admin. Code tit. 7, § 27–8.24. Specifically, N.J Admin. Code section 7:27–8.24 provides that permit applicants may construct proposed facilities during the pendency of their applications as long as "[t]he construction, reconstruction, installation, and/or placement is not prohibited by any Federal law or requirement." *Id.* To state the obvious, federal law includes Title VI. It is clear from the record that SLC was aware of the

---

14. Inexplicably, the NJDEP never undertook such an analysis, which is precisely what

prompted Plaintiffs to file the present suit.

NJDEP's Title VI obligations and of the demographics of the neighborhood and the residents' concerns about potential civil rights violations prior to its construction of the facility, yet chose to proceed with construction of the facility. SLC cannot now argue that it will suffer irreparable harm based on its own assumption of the risk in constructing the facility. Finally, the Court notes that under New Jersey law, while a permit applicant is allowed to begin construction prior to the issuance of a permit, the statute which provides this allowance also explicitly states that any costs incurred by an applicant in connection with such construction may not be used by the applicant as grounds for an appeal of the department's decision on the permit application. *See* N.J.S.A. § 26:2C–9.2(j); N.J. Admin. Code tit. 7 § 27–8.24. Similarly, this Court concludes that the pre-permitting costs incurred by SLC based on its assumption of the risk that its permits might ultimately be denied cannot serve as a basis for limiting the public's right to challenge a permitting decision.

243.   Finally, SLC argues that a preliminary injunction is against the public interest because it would "thwart the public interest in a revitalized Camden." SLC Br. at 59. What is clear from the record, however, is that the already poor health of the community in which the facility is located is likely to be adversely affected by the operation of the facility, and that the NJDEP did not consider either the health status or the cumulative environmental burdens in this community prior to issuing the permits. Based on these facts, the Court concludes that the public interest clearly weighs in favor of granting Plaintiffs' request to enjoin the operation the facility until the NJDEP has conducted an adverse disparate impact analysis in accordance with its obligations under Title VI.

244.   Finally, this Court concludes that requiring the NJDEP to comply with the EPA's Title VI implementing regulations is inherently in the public interest, insofar as it ensures the protection of civil rights within the context of environmental permitting decisions. *See, e.g., Government of Virgin Islands, Dept. of Conservation and Cultural Affairs v. Virgin Islands Paving, Inc.,* 714 F.2d 283, 286 (3d Cir. 1983) (explaining that "one of the most significant factors to be considered is the public interest which underlies [the environmental act].")

245.   Thus, having considered the arguments set forth by Plaintiffs, the NJDEP, and SLC concerning the factors of harm to non-moving parties and public interest, I conclude that both factors weigh in favor of a grant of preliminary injunctive relief to Plaintiffs.

### W.   *Availability of Injunctive Relief*

246.   SLC's final argument, in opposing Plaintiffs' request for preliminary injunctive relief, is that Plaintiffs seek relief from this Court which is unavailable under EPA's regulations. Specifically, SLC notes that the remedy provided in EPA's implementing regulations to address non-compliance with the regulations, is "to terminate or refuse to award or to continue assistance" to a recipient whose permitting practices are found to be in violation of Title VI. 40 C.F.R. § 7.130(a). The regulations, however, go on to state that "EPA may also use any other means authorized by law to get compliance, including a referral of the matter to the Department of Justice." *Id.* SLC also cites the EPA's Revised Draft Investigation Guidance, in which the EPA states that "it is expected that denial or revocation of a permit is not necessarily an appropriate solution, because it is unlikely that a particular permit

is solely responsible for the adverse disparate impacts." 65 Fed.Reg. 38650, 39683.

247. First, I note that SLC's argument misconstrues the relief which Plaintiffs have requested and which I am granting. I am not "revoking" SLC's permits, but rather enjoining SLC from operating under the permits until the NJDEP performs an appropriate adverse disparate impact analysis in compliance with Title VI. While I have concluded, based on the evidence in the record before me, that Plaintiffs have established a likelihood of success on the merits that the permitting of the SLC facility will have an adverse, disparate impact in violation of Title VI, I have done so only in the context of issuing a preliminary injunction. It is now up to the NJDEP in the first instance to reevaluate its permitting decision with respect to the SLC facility after conducting the requisite adverse, disparate impact analysis.

248. Second, as Plaintiffs note, the Third Circuit has recognized Plaintiffs' right to seek injunctive relief in a Title VI disparate impact case. *See Powell v. Ridge*, 189 F.3d at 398–401; *see also Cheyney State College Faculty v. Hufstedler*, 703 F.2d 732, 737 (3d Cir.1983).[15]

249. Based on the applicable provisions of the EPA regulations and Third Circuit precedent, I conclude that Plaintiffs are entitled to seek preliminary injunctive relief in this Court.

## X. WAIVER OF SECURITY

250. Federal Rule of Civil Procedure 65(c) requires that an applicant for a preliminary injunction must post some form of security. *See* Fed.R.Civ.P. 65(c). Plaintiffs have asked this Court to waive this requirement pursuant to the test set forth by the Third Circuit in *Temple Univ. v. White*, 941 F.2d 201 (3d Cir.1991), *cert. denied sub. nom, Snider v. Temple Univ.*, 502 U.S. 1032, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992). In *Temple*, the Third Circuit set forth the following test, to be used to determine whether an applicant for preliminary injunctive relief may be exempted from the security requirement of Rule 65(c): "[T]he court first should weigh the potential loss to the enjoined party against the hardship that a bond requirement would impose on the applicant. Second, the court should consider whether the application seeks to enforce a significant federal right or a matter of public interest." *McCormack v. Tp. Of Clinton*, 872 F.Supp. 1320, 1327 (D.N.J.1994 (Brown, J.) (citing *Temple*, 941 F.2d at 219).

251. Applying the test set forth by the Third Circuit in *Temple*, this Court concludes that it may waive the security requirement of Rule 65(c) for Plaintiffs in this case. With respect to the first factor, there is no loss to the NJDEP, nor has the NJDEP requested security or opposed Plaintiffs' application to the Court to waive the posting of security.

252. SLC, however, opposes Plaintiffs' request to waive the posting of security, contending that it will suffer a significant financial loss, in the amount of $200,000 per week of estimated earnings, if the

---

**15.** In *Cheyney*, the Third Circuit explained that *"N.A.A.C.P. v. Medical Center, Inc.*, 599 F.2d 1247, 1250 n. 10 (3d Cir.1979), held that Title VI creates a private right of action for plaintiffs who seek relief other than funding termination, and that preliminary recourse to agency remedial procedures is not required. In *Chowdhury v. Reading Hospital & Medical Center*, 677 F.2d 317, 322 n. 13 (3d Cir.1982), *petition for cert. filed*, 51 U.S.L.W. 3120 (U.S. Aug. 24, 1982) (No. 82–201), we observed that administrative exhaustion is not a prerequisite to a private suit under Title VI because 'the termination of federal funding, which is the only real administrative weapon under Title VI, is completely inadequate for providing relief to individual complainants." *Id.*

injunction issues. SLC contends that *Temple* is limited to cases in which the imposition of an injunction imposes no risk of monetary harm to the enjoined party, and is therefore inapplicable to this case. SLC Br. at 57–58.

253. To support its position, SLC relies on *Alexander v. Primerica Holdings, Inc.,* 811 F.Supp. 1025 (D.N.J.1993). *Primerica* involved a class action suit brought by a group of retirees against their former employers' successor, claiming that the defendant violated the Employee Retirement Income Security Act ("ERISA") by raising their medical and life insurance policy contributions from the amount required by the predecessor employer. *Id.* at 1027. The parties requested a ruling on whether the plaintiffs would be required to post a bond and, if so, in what amount, prior to a ruling on the merits of plaintiffs' motion for a preliminary injunction. *Id.* The Court found that an injunction requiring Primerica to continue to bear the financial burden for maintaining the medical and life insurance coverage for all plaintiffs in the class would cause Primerica to expend over $1.7 million before a trial could be had on the merits, and over $ 7 million before the appeals process had run its course. *Id.* at 1036. Rejecting Plaintiffs' argument that because they were indigent, the requirement that they post a bond would preclude them from pursuing their claims, the Court held that the " 'chilling' effect of a bond cannot, by itself, justify waiving the bond requirement" when there is significant economic risk to the party which would be enjoined. *Id.* The Court held that the plaintiffs, should they succeed in their motion for preliminary injunctive relief, would be required to post a bond in the amount of $7,333,514.

254. I conclude that SLC's argument, and the decision in *Primerica,* are inapplicable to this case for three reasons. First, SLC has admitted that, "due to further unexpected construction delays," unrelated to this litigation, SLC was not ready to commence operations as of the date Plaintiffs filed the present motion, on February 14, 2001, nor did they indicate that the facility was operational as of the date of Oral Argument, March 23, 2001. Meadows Decl. at ¶ 17. SLC projected that it would be in position to commence operations "no later than March 31, 2000." *Id.* Because it is unclear from the existing record whether SLC is in fact ready to begin operations at all, it is unclear whether enjoining it from so doing for thirty days will cause SLC any economic loss whatsoever.

255. Second, the individual Plaintiffs in this case are in fact indigent, and the organizational Plaintiff, SCCIA, is a not-for-profit community organization that has no financial resources. Pomar Cert. at ¶ 20.

256. Most importantly, Plaintiffs in this case, unlike plaintiffs in *Primerica,* are seeking to enforce "significant federal right[s]," namely, those rights protected by Title VI of the Civil Rights Act of 1964. Furthermore, to the extent that Plaintiffs are seeking to compel the NJDEP to consider the potential adverse impacts of the proposed facility's emissions on a population which already suffers significant respiratory distress and is overwhelmingly minority, it is clear that the Plaintiffs have brought this suit in the public interest.

257. Based on the facts of this case and the nature of Plaintiffs' claims, I conclude that this case falls within that class of "certain narrowly drawn circumstances" in which the Third Circuit has deemed a waiver of security to be appropriate. *Temple,* 941 F.2d at 219. Specifically, I hold that this case concerns the public interest and is based on the enforcement of important federal rights. *See Temple,* 941 F.2d at 219–20. Accordingly, based on the Third's Circuit's decision in *Temple,* I

shall waive the requirement that Plaintiffs post security in this case.

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs' application for a preliminary injunction is granted. The air permits issued by NJDEP to SLC are vacated. This case is remanded to NJDEP and Commissioner Shinn to make appropriate findings consistent with this Opinion, which shall be filed with this Court within thirty days. SLC shall be enjoined from operating its proposed facility until further order of this Court. This Court shall retain jurisdiction. The Court shall enter an appropriate form of order.